**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
                    *Plaintiff-Appellee,*

v.

KEVIN ERIC CURTIN,
                    *Defendant-Appellant.*

No. 04-10632

D.C. No.
CR-04-00064-RCJ/
PAL

OPINION

Appeal from the United States District Court
for the District of Nevada
Robert C. Jones, District Judge, Presiding

Argued and Submitted En Banc
October 3, 2006—San Francisco, California

Filed May 24, 2007

Before: Mary M. Schroeder, Chief Judge, and
J. Clifford Wallace, Harry Pregerson, Alex Kozinski,
Stephen S. Trott, Pamela Ann Rymer, Andrew J. Kleinfeld,
Sidney R. Thomas, Barry G. Silverman, Susan P. Graber,
M. Margaret McKeown, Kim McLane Wardlaw,
Marsha S. Berzon, Jay S. Bybee, Consuelo M. Callahan,
Circuit Judges.

Opinion by Judge Trott;
Concurrence by Judge Kleinfeld;
Concurrence by Judge McKeown;
Concurrence by Judge Wardlaw

**COUNSEL**

Cal J. Potter, III, Potter Law Offices, Las Vegas, Nevada, for the defendant-appellant.

Nancy J. Koppe, Assistant United States Attorney, and Robert L. Ellman, Appellate Chief, United States Attorneys' Office, Las Vegas, Nevada, for the plaintiff-appellee.

**OPINION**

TROTT, Circuit Judge:

As the end result of a successful law enforcement sting designed to apprehend sexual predators searching for potential juvenile victims on the Internet, appellee Kevin Eric Curtin was convicted in federal court by a jury of the felony crimes of (1) traveling across state lines with intent to engage in a sexual act with a minor, in violation of 18 U.S.C. § 2423(b), and (2) using an interstate facility to attempt to persuade a minor to engage in sexual acts, in violation of 18 U.S.C. § 2422(b). To prove that Curtin harbored the specific subjective intent these crimes require, the government used as evidence lewd stories describing sexual acts between adults and children in Curtin's immediate possession when arrested.

Relying in large measure on an alternative holding in *Guam v. Shymanovitz*, 157 F.3d 1154 (9th Cir. 1998) (as amended), a divided panel of this Court reversed Curtin's conviction on the ground that the district court erred in admitting in evidence the sexually explicit materials in his possession for the limited purpose of shedding light on Curtin's intent with

respect to his conduct and behavior toward the object of his travel across state lines. *United States v. Curtin*, 443 F.3d 1084, 1094 (9th Cir. 2006). Guided by language in *Shymanovitz*, the panel concluded that " 'Possession of lawful reading material is simply not the type of conduct contemplated by Rule 404(b)' " of the Federal Rules of Evidence. *Id.* at 1091 (quoting *Shymanovitz*, 157 F.3d at 1159).

We took this case en banc (1) to revisit the panel's decision, and (2) to reexamine *Shymanovitz*'s categorical exclusion as a matter of law of reading materials from the varieties of evidence that might otherwise fall within the reach of Rule 404(b). We have jurisdiction over the appeal pursuant to 28 U.S.C. § 1291, and, because of a serious flaw in the manner in which the trial court reviewed Curtin's stories pursuant to Federal Rule of Evidence 403, we reverse and remand for a new trial.

# I

On the afternoon of February 11, 2004, Las Vegas Metropolitan Police Department Detective Michael Castaneda, while patrolling the Internet as a 14-year-old girl using the screen name "christy13,"[1] entered a chat channel labeled "lt-girlsexchat." He received an instant message from Curtin, who used the screen name "M-42SOCAL." According to the evidence, the chat channel is a place where people go to talk sex with little girls.

The detective, as "Christy," and Curtin "chatted" through instant messaging for approximately four hours. They exchanged photos early in the conversation. Castaneda sent Curtin a picture of a female police officer, taken when she was fourteen years old. Curtin said his name was "Kenny"

---

[1] With thanks to Judge Wallace, we use in large measure and without further attribution his excellent statement of the facts and background from the panel opinion.

and that he was forty-two years old, divorced, and living in Anaheim, California. He told Christy that he was planning to travel to Las Vegas, Nevada, on Friday, February 13, and invited her to go to a "Penn and Teller" show on Sunday, February 15. Penn and Teller are well-known magicians who perform regularly in Las Vegas. Christy agreed.

Curtin extensively discussed sex with Christy during this conversation, saying that he would love for her to "spend the night" after the show and hoped to "get a room." Curtin told Christy, "I want to make you happy . . . . If you were masturbating and fantasizing about sex, I'd love to have sex with you." He added that they "could just make out or I could just give you oral sex or we could just fool around." Finally, Curtin made plans to meet Christy in the bowling alley of a Las Vegas casino at 2:00 p.m. on Sunday, February 15. At the end of the conversation, Curtin asked Christy to try sleeping naked that night, and to "imagine my face moving between your legs and licking you. Imagine my tongue penetrating you."

The next day, Curtin sent Christy an email message saying, "I can't tell you how much I'm looking forward to Sunday. We're going to have a great time." The detective and Curtin later that day had another "chat" during which Curtin continued to make explicit references to having sex with Christy. Curtin concluded the "chat" by confirming their meeting and telling Christy that he, as her relative Uncle Kevin, would introduce her to Penn and Teller as his "niece," adding, "Let's not get caught, ever."

On that Sunday, the police officer whose picture was sent to Curtin waited in the bowling alley as a decoy, dressed in the clothes that Christy indicated she would be wearing. Eight to ten other law enforcement officers also were present. Curtin entered the bowling alley at 1:45 p.m. and walked toward the area where the decoy officer was sitting. He walked past her and then turned and walked past her again, looking at her

each time. Curtin then left the area where the decoy was sitting and went to the back of the bowling alley, where he used his personal digital assistant. At the request of law enforcement officers, a casino security guard approached Curtin and asked for identification. Curtin showed the guard a United States passport and subsequently left the bowling alley area of the casino.

Curtin reentered the bowling alley at approximately 2:05 p.m. He looked around and again walked to the area where the decoy officer was sitting. After less than a minute, he moved closer to her, looking in her direction the entire time. He stopped behind the officer, and she turned and said "hi" to him. Whether he said "hi" in return is disputed.

Curtin then left the bowling alley and started getting into a van, at which point law enforcement officers stopped and asked him for identification. He was detained by police and advised of his *Miranda* rights. After he waived these rights, he agreed to speak with the law enforcement officers. In a voluntary statement, he stated that he had traveled by car to Las Vegas for meetings. He explained that he was at the bowling alley to meet a female friend he had met on the internet. He admitted to using the screen name and email address used to contact Christy. Curtin explained that he often enters chat rooms and "role play[s]" as if he is engaged in "daddy/ daughter" type conversations, and that he expected Christy to be a thirty- to forty-year-old woman pretending to be a girl.

Curtin was then arrested by the Las Vegas police. The personal digital assistant, which was taken from him at the time of his arrest, contained in the form of text over 140 stories about adults having sex with children. The laptop contained a list of chat channels that Curtin had used in the past, as well as pictures of girls whose names matched some of those in his "chat" list.

Curtin was indicted on one count of travel with intent to engage in a sexual act with a juvenile, in violation of 18

U.S.C. § 2423(b), and one count of coercion and enticement, in violation of 18 U.S.C. § 2422(b).

## II

### A.

Prior to the trial, it became clear that the only disputed issue in this case would be Curtin's subjective intent: did he intend to hook up sexually with a minor, or with a 30- to 40-year-old woman who liked to engage in sex acts while pretending she was a child having incestuous sex with her daddy? Curtin first framed this issue in a motion in limine to dismiss the indictment on the ground that the "undisputed and uncontested facts" made it patently obvious that the government had "no credible evidence to suggest that [Curtin's] subjective intentions were to travel to Las Vegas to have sex with a minor":

> Curtin did not possess an intent to have sex with a 14 year old girl when he got into his car and drove to Las Vegas; the overwhelming evidence points the other way. His voluntary statement, given minutes after he was stopped by the police, shows this. . . . [W]hen he left California to go to Las Vegas, he was going to find work, and at the time he left California to travel to Nevada, he had no intentions of having relations with a minor, as irrebuttably shown by the fact that he did not so much as talk to the person.

> . . . Curtin's intentions were to try to meet a 30-40 year old woman who had been fantasizing. It is not even close.

> . . . As the defendant's intent was not to have sex with a minor, nor to entice a minor, nor to travel interstate to have sex with a minor, . . . this case must be dismissed. In the instant case, the defendant

did not think he was dealing with a minor. The police knew there [was] not a minor and in fact there was not a minor.

(Emphasis added.)

Thus, the line was drawn. Curtin's defense was a matter of record, and he would not seriously contest the other elements of the crimes charged against him. The trial would be about the sole issue of intent and what was in Curtin's mind during his undisputed conduct with "christy13."

In order to convince the jury that Curtin was actually innocent, his attorney presented him in opening statement as an "illusionist" by trade, a professional who "immerses himself in a role. It's not even close to the same thing as doing it, especially when you are an illusionist. Have you ever gone to a magic show and think that something is really real but you know that it's not but you get yourself involved in it?" "The evidence will show that Kevin was an individual involved in fantasy chat rooms and that he was engaged in role playing and that he didn't even use his own name." "[H]e was, what is called, 'cybersex' role-playing. He thought it was someone his age that he was dealing with and that they would role-play in a situation much like a dad and a daughter." "He did not do what the government believed he would do because, as I said before, he was merely engaged in role-playing and fantasy."

Curtin took the stand and reiterated the theme that his intent was to find a consenting adult, not a minor. Repeating this assertion, counsel then moved unsuccessfully for a directed verdict. Counsel emphasized this what-was-in-Curtin's-mind theme by telling the jury in final summation that "this is the type of crime that is a situation where you have to look at the thoughts."

## B.

Confronted with Curtin's aggressive incest-fantasy-intent defense — to sexually play daddy/daughter incest, not with a minor but with an adult — and facing the traditional demanding burden of proof beyond a reasonable doubt, the government offered as part of its case-in-chief stories contained on Curtin's personal digital assistant, or "PDA." These stories were offered in evidence for two equally germane purposes: (1) to prove that Curtin harbored the subjective intent made unlawful by law, and (2) to rebut in anticipation Curtin's lack-of-intent defense that the daughter in his daddy/daughter sexual fantasy was an adult pretending to be a child.

Regarding its burden to prove actionable intent, the government argued to the court that the stories showed "[w]hat his fantasies are and this shows his intent. Counsel [for Curtin] argued he never had the intent to have sex with a child. This goes to show he had intent." "[T]he intent that's involved in this particular offense is to establish, of course, that he crossed the state lines in order to have intent [sic] with a minor." "And intent is . . . the predominant purpose for which these are admissible."

As to impeaching Curtin's daddy/adult daughter defense, the government said that these stories

> go directly against his defense that he had no intent to engage in sex with children. . . . The defendant is the one who is saying I didn't have the intent, I never had that intent. And these stories that the defendant possessed and that the defendant carried around with him everywhere he went and when he was committing this crime, they show his intent.
>
> . . . These stories not only go to an element of the crime — intent is one of the most important elements of the crime, actually — it goes to the element

of the crime that the defendant himself is attacking, pretty much the only element the defendant is attacking.

## C.

Federal courts repeatedly have held that the government may offer evidence in its case-in-chief in anticipation of an expected aspect of the defense. For example, in *United States v. Veltre*, 591 F.2d 347 (5th Cir. 1979), the appellant complained that the government had been allowed on direct examination of a cooperating codefendant to introduce her plea of guilty to the crime for which Veltre was on trial. The Fifth Circuit said,

> By disclosing Ms. Leone's guilty plea in opening argument, the Government anticipated defense counsel's primary defense of impeaching the credibility of the Government's key witness through proof of her guilty plea and showing benefits to her in having counts dismissed and in obtaining leniency of sentence. In fact, defense counsel early in the proceedings attacked the credibility of Ms. Leone as "the architect of this crime" and announced his intention to introduce evidence of the plea bargain.

> Defense counsel's expected defense on this theory was merely brought out in advance by the Government to blunt adverse impact on the jury and to minimize the impression that the Government was trying to conceal Ms. Leone's guilty plea. Where, as here, the codefendant is a witness at trial, subject to the rigors of cross-examination, disclosure of the guilty plea to blunt the impact of attacks on her credibility serves a legitimate purpose and is permissible.

*Id.* at 349.

In a similar situation, in *United States v. King*, 505 F.2d 602 (5th Cir. 1974), the prosecution was permitted on direct examination peremptorily to counter thunder from the defense by introducing evidence of its witness's prior felony convictions. The court said,

> Upon reviewing the record, we are firmly convinced that it presents no reversible error. Defense counsel's arguments to the jury and his references to [the witness's] criminal record made it almost essential for the prosecution to bring out [the witness's] convictions on direct examination. Once [the witness's] background was injected into the case by defense counsel, his record could not be ignored by the Government.

*Id.* at 608 (footnote omitted).

In our own Circuit, the rule permitting anticipatory impeachment on direct is the same. In *United States v. Halbert*, 640 F.2d 1000, 1005 (9th Cir. 1981) (per curiam), we said, "The prosecutor may also wish to place the plea [of a cooperating codefendant] before the jury [in its case-in-chief] so as to blunt defense efforts at impeachment and dispel the suggestion that the government or its witness had something to hide." *See also United States v. Necoechea*, 986 F.2d 1273, 1280 n.4 (9th Cir. 1993); *United States v. Henderson*, 717 F.2d 135, 137 (4th Cir. 1983).

### D.

On the second day of trial, the government offered two of the stories, "My Little Sister" and "Love for the World," to show modus operandi, intent, preparation, and knowledge. They were admitted conditionally over Curtin's hearsay and foundation objections, and over his objection incorporating the prior motion counsel had filed and the district court had

denied. The stories were neither circulated nor read to the jury.

The technician who extracted the stories from Curtin's PDA testified that both stories were about a father having sex with his young daughter and the daughter's enjoyment of the experience. However, when the government sought to introduce a third story, "Melanie's Busy Day," the district court stopped the questioning. The court allowed the government to ask general questions, such as whether the stories related to sex between a minor and an adult, but did not unconditionally admit them. Recognizing the potentially prejudicial nature of the stories, and acknowledging Curtin's argument based on Rule 404(a) that the evidence constituted inadmissible character or propensity evidence, the court held that a story could be entered into evidence only if it tied into Curtin's intent, knowledge, preparation, or modus operandi; in other words, if it had some relevance to the charges. In this connection, the court instructed the jurors as follows:

> THE COURT: Counsel intends to offer evidence of items recorded — held on the PDA. This evidence is only offered for a limited purpose.

> That means that the defendant is on trial only for things he is alleged to have done in the Indictment. He cannot be convicted of proclivities, for example.

> Therefore, you cannot take any of this evidence for simple proclivity. He can only be convicted for conduct he is alleged to have done in the Indictment.

> Therefore, each time Prosecution intends to offer one of these items stored on the PDA, I have required them to state the purpose; for example, the intent of the defendant or his knowledge or his method.

But it cannot be taken generally for his proclivity. No one can be convicted for simply their proclivity or thoughts. They can only be convicted for acts that they are alleged to have done with the appropriate intent.

So if you understand what I'm saying, I'm giving you a limiting instruction. You may only take this evidence for the limited purpose which the prosecution will tell us it's offered for and not generally for defendant's proclivity.

The government then asked the court to make a preliminary legal determination about the admissibility of the remaining stories. The government argued that "Melanie's Busy Day" was admissible to show intent, modus operandi, preparation, and knowledge because it had language similar to that used by Curtin in his email to Christy, namely, language concerning oral sex and a child masturbating. The government argued that "Missing Big Brother," which discussed how the adult did not want to hurt the child during sex, also was admissible for intent, modus operandi, preparation, and knowledge. The government made similar arguments with regard to seventeen other stories, with titles such as "I'm Being Molested," "The Good Girl," "A Relative Interest," "Restrictions," "Teaching the Kids," and "Mommy Juice."

The following morning, Curtin renewed his objection to the admission of the stories, arguing that they were highly prejudicial and were being admitted only to show propensity or proclivity, in violation of Rule 404(a). Rule 404(a) bans the use of "character" evidence to prove action "in conformity therewith on a particular occasion . . . ." Eventually, after more argument and extensive offers of proof, but without reading the stories in their entirety, the district court agreed to admit with limiting instructions five of the stories: "My Little Sister" (which involved incest and the impregnation of a nine-year-old girl), "Love for the World" (which involved incest),

"Melanie's Busy Day" (which involved an eleven-year-old girl initiating sex with, among others, her father and her teacher), "Restrictions" (same), and "Daddy's Lessons" (same).

## E.

Curtin contends here, as he did at trial, that (1) the five stories amounted to inadmissible character evidence, introduced only to show propensity in violation of Rule 404(a) of the Federal Rules of Evidence, and (2) that the probative value of the stories was exceeded by their potential prejudice, in violation of Rule 403. The government responds that the stories fall outside the parameters of Rule 404 altogether because they are inextricably intertwined with the charged crimes.[2] Alternatively, the government argues that the stories were properly admitted under Rule 404(b), not as general bad character or propensity evidence, but as evidence of acts tending to prove Curtin's intent. Finally, the government asserts that the admission of the stories did not violate Rule 403.

Curtin objected also to the admission of the stories in the district court, relying, *inter alia*, on *Guam v. Shymanovitz*, 157 F.3d 1154 (9th Cir. 1998) (as amended). Shymanovitz was a middle-school guidance counselor who was charged with sexually and physically abusing several of the boys under his supervision. *Id.* at 1155. Both *Shymanovitz* and this appeal address whether sexually explicit reading material is admissible under Rule 404(b). We concluded in *Shymanovitz* that the magazine articles failed to constitute a Rule 404(b) "bad act." "[P]ossession of lawful reading material is simply not the type of conduct contemplated by Rule 404(b)." *Id.* at 1159. Additionally, we held that possession of lawful reading

---

[2]Because we conclude that the stories contained relevant evidence that was admissible pursuant to Rule 404(b), we need not address the government's contention that they were admissible as "inextricably intertwined" with the alleged offenses.

material was not similar to actual criminal conduct, thus failing the third criterion of the *Spillone* test. "[T]here is simply no doubt that a wide gulf separates the act of *possessing* written descriptions or stories about criminal conduct from the act of *committing* the offenses described." *Id.*

**F.**

We review for an abuse of discretion a district court's admission of evidence. *United States v. Romero*, 282 F.3d 683, 688 (9th Cir. 2002). We review also for an abuse of discretion a court's decision that the probative value of evidence exceeds its potential for unfair prejudice. *See id.* at 520.

**III**

**A.**

**Relevancy**

**[1]** Rule 402 of the Federal Rules of Evidence declares that "[a]ll relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority." In turn, Rule 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." To be "relevant," evidence need not be conclusive proof of a fact sought to be proved, or even strong evidence of the same. All that is required is a "tendency" to establish the fact at issue. The Advisory Committee Notes to the 1972 Proposed Rules remind us that "[r]elevancy is not an inherent characteristic of any item of evidence but exists only as a relation between an item of evidence and a matter properly provable in the case." In that relation, "[t]he fact to be proved may be ultimate,

intermediate, or evidentiary; it matters not, so long as it is of consequence in the determination of the action." *Id.*

**[2]** Rule 404, which separately deals with "character" evidence, and its subsection 404(b), which covers evidence of other (1) crimes, (2) wrongs, or (3) acts,³ is not a different pathway to the admission of evidence — although it is frequently misunderstood as such. Rule 404 is simply a specific qualification of the general rule of the admissibility of all relevant evidence. Rule 404, upon which Curtin's counsel relied in the district court, renders inadmissible evidence of a person's general character if used to show propensity or proclivity. The clear purpose of this Rule is to confront as a matter of law the proposition that a person's bad character as demonstrated by behavior is relevant and therefore admissible to prove that he acted in conformity therewith. Once again, the Advisory Committee Notes to the 1972 Proposed Rules illustrate the discrete purpose of Rule 404:

> Character evidence is of slight probative value and

---

³The "acts" described need not be "bad" acts, even though "bad" is the improper adjective sometimes misused to describe them. *See Curtin*, 443 F.3d at 1091 ("We concluded in *Shymanovitz* that the magazine articles failed to constitute a Rule 404(b) 'bad act.' ") (citation omitted). Rule 404(b) covers not just other crimes or wrongs, but also explicitly "other acts" — if the "other" acts are relevant to the purposes specified in the rule such as intent, motive, preparation, knowledge, etc. The other "act" does not need to be "bad," just relevant in such a way as to avoid being nothing more than character or propensity evidence. *See United States v. Johnson*, 27 F.3d 1186, 1192 (6th Cir. 1994) (explaining that, "where there is thrust upon the government, either by virtue of the defense raised by the defendant or by virtue of the elements of the crime charged, the affirmative duty to prove that the underlying prohibited act was done with a specific criminal intent, *other acts evidence* may be introduced under Rule 404(b)"), (emphasis added); *cf. United States v. Brand*, 467 F.3d 179, 207 (2d Cir. 2006) ("[P]rior acts evidence admitted under Rule 404(b) . . . [requires] 'some connection' between the reason for introducing the prior act and the nature of the crimes charged."). Any language in *Shymanovitz* to the contrary is disapproved.

may be very prejudicial. It tends to distract the trier
of fact from the main question of what actually hap-
pened on the particular occasion. It subtly permits
the trier of fact to reward the good man and to pun-
ish the bad man because of their respective charac-
ters despite what the evidence in the case shows
actually happened.

*Id.* (internal quotation marks omitted).

Understood in this light, Rule 404(b) is merely a clarifica-
tion of the general rule precluding the shotgun use of extrinsic
"bad man" evidence. Rule 404(b), as explained by the notes,

deals with a specialized but important application of
the general rule excluding circumstantial use of char-
acter evidence. Consistently with that rule, evidence
of other crimes, wrongs, or acts is not admissible to
prove character as a basis for suggesting the infer-
ence that conduct on a particular occasion was in
conformity with it. However, the evidence may be
offered for another purpose, such as proof of motive,
opportunity, and so on, which does not fall within
the prohibition. In this situation the rule does not
require that the evidence be excluded. No mechani-
cal solution is offered.

*Id.*

[3] Rule 404(b) is a rule of inclusion — not exclusion —
which references at least three categories of other "acts"
encompassing the inner workings of the mind: motive, intent,
and knowledge. Once it has been established that the evidence
offered serves one of these purposes, the relevant Advisory
Committee Notes make it clear that the "only" conditions jus-
tifying the exclusion of the evidence are those described in
Rule 403: unfair prejudice, confusion of the issues, mislead-

ing the jury, undue delay, waste of time, or needless presentation of cumulative evidence:

> The second sentence of Rule 404(b) as submitted to the Congress began with the words "This subdivision does not exclude the evidence when offered". The Committee amended this language to read "It may, however, be admissible", the words used in the 1971 Advisory Committee draft, on the ground that this formulation properly placed greater emphasis on admissibility than did the final Court version. House Report No. 93-650.

> This rule provides that evidence of other crimes, wrongs, or acts is not admissible to prove character but may be admissible for other specified purposes such as proof of motive.

> Although your committee sees no necessity in amending the rule itself, it anticipates that the use of the discretionary word "may" with respect to the admissibility of evidence of crimes, wrongs, or acts is *not intended to confer any arbitrary discretion on the trial judge. Rather, it is anticipated that with respect to permissible uses for such evidence, the trial judge may exclude it only on the basis of those considerations set forth in Rule 403, i.e., prejudice, confusion or waste of time*. Senate Report No. 93-1277.

1974 Enactment, Note to Subdivision (b) (emphasis added).

The Supreme Court embraced this inclusionary understanding of Rule 404(b) and its handling of "other acts" in *Huddleston v. United States*, 485 U.S. 681 (1988):

> Federal Rule of Evidence 404(b)—which applies in both civil and criminal cases—generally prohibits

the introduction of evidence of extrinsic acts that might adversely reflect on the actor's character, unless that evidence bears upon a relevant issue in the case such as motive, opportunity, or knowledge. Extrinsic acts evidence may be critical to the establishment of the truth as to a disputed issue, *especially when that issue involves the actor's state of mind and the only means of ascertaining that mental state is by drawing inferences from conduct*.

*Id.* at 685 (emphasis added).

Moreover, the Court explicitly embraced the Advisory Committee's inclusionary understanding of the Rule as reflecting the intent of Congress:

Petitioner's reading of Rule 404(b) as mandating a preliminary finding by the trial court that the act in question occurred not only superimposes a level of judicial oversight that is nowhere apparent from the language of that provision, but it is simply inconsistent with the legislative history behind Rule 404(b). The Advisory Committee specifically declined to offer any "mechanical solution" to the admission of evidence under 404(b). Rather, the Committee indicated that the trial court should assess such evidence under the usual rules for admissibility: "The determination must be made whether the danger of undue prejudice outweighs the probative value of the evidence in view of the availability of other means of proof and other factors appropriate for making decisions of this kind under Rule 403." *[S]ee also* S. Rep. No. 93-1277, p. 25 (1974) ("[I]t is anticipated that with respect to permissible uses for such evidence, the trial judge may exclude it only on the basis of those considerations set forth in Rule 403, i.e. prejudice, confusion or waste of time").

Petitioner's suggestion that a preliminary finding is necessary to protect the defendant from the potential for unfair prejudice is also belied by the Reports of the House of Representatives and the Senate. The House made clear that the version of Rule 404(b) which became law was intended to "plac[e] greater emphasis on admissibility than did the final Court version." The Senate echoed this theme: "[T]he use of the discretionary word 'may' with respect to the admissibility of evidence of crimes, wrongs, or other acts is not intended to confer any arbitrary discretion on the trial judge." Thus, Congress was not nearly so concerned with the potential prejudicial effect of Rule 404(b) evidence as it was with *ensuring that restrictions would not be placed on the admission of such evidence*.

*Id.* at 688-89 (citations omitted) (emphasis added).

## B.

## The Stories

The material on Curtin's PDA in his possession when he arrived in Las Vegas to meet Christy consisted of approximately 140 prurient stories containing graphic descriptions of sexual acts with minors. With one exception, which we will discuss in connection with our Rule 403 analysis, the five stories admitted in evidence are built around daddies having sexual relations with *child* daughters, not adults, and the blunt and descriptive sexual content of the stories parallel Curtin's email exchanges with Christy.

## C.

## Curtin's Emails

To illustrate the shared material similarities between the stories in Curtin's PDA and the escalating salacious enticements he made online to "christy13," here are some representative examples of his email conversations with her. They tend to show — as do the stories — an adult intending to initiate a young virgin into the world of adult sex:[4]

Christy: You don't mind that I'm 14?

Curtin: Do you mind that I'm 42?

Christy: No, not at all.

Curtin: Have you ever been with an older guy?

Christy: No, I'm still a virgin, if that is what you're asking.

Curtin: Well, what would you want to do with me? I'd love to make out with you. Is that weird?

. . .

Curtin: Do you masturbate?

Christy: No, never have . . . .

. . .

Curtin: Do you never get urges?

---

[4]For ease of reading the format has been modified. The content of the conversation is unaltered. We use the word "adult" advisedly.

Christy: What do you mean?

Curtin: You never feel horny?

Christy: No. Is that okay?

. . .

Curtin: Do you have periods yet?

Christy: Yes.

Curtin: I just logged on and looked at your picture. You're so sexy that it's hard to believe you don't get horny.

Christy: I don't think that I'm pretty.

Curtin: I think you are, and I think you're sexy.

Christy: Thanks.

. . .

Christy: What should I do or how should — how far should I go?

Curtin: I'll probably go as far as you want to go.

Christy: I want to make you happy.

Curtin: I want to make you happy, too. If you were masturbating and fantasizing about sex, I'd love to have sex with you. But since you're not, I don't want to push you past anything you're ready for . . . .

. . .

Christy: I heard that it hurts the first time. Also, that you can get pregnant real easy . . . .

Curtin: There are things we can do to stop that.

. . .

Curtin: Or, we could just make out or I could just give you oral sex or we could just fool around.

Christy: Would it hurt if you gave me oral sex?

Curtin: No, not at all.

. . .

Christy: What should I bring to sleep in, my pj's or will my jeans and shirt be okay?

Curtin: Nothing. I don't want you to sleep in anything.

Christy: Really? Not even my underwear? Won't that be a little uncomfortable?

Curtin: No, that's the best way to sleep, all cuddled up, two naked bodies.

Christy: Okay, if you say so. I just think it would be uncomfortable.

Curtin: Try tonight and tell me if it is. And imagine my face moving between your legs and licking you. Imagine my tongue penetrating you.

Christy: I can't. Mom and Dad come in at night and check in on me and tell me all the time that they cover me up with my blanket. So they would see that

I was naked and would ask me why. Plus, if my dad saw me naked, I would be so embarrassed.

. . .

Christy: It won't hurt, right?

Curtin: No, it won't hurt.

. . .

Curtin: Have you thought about my head between your legs, licking you?

Christy: Yes. Kind of curious what that will feel like.

Curtin: Have you touched yourself there?

Christy: Only while taking a shower to was [sic] myself. Am I weird?

Curtin: No, I just thought you might have when thinking about me, about — thinking about we're going to do.

. . .

Curtin: I did, by the way. I looked at your picture and played with myself thinking about what it would feel — what it would be like to have sex with you. You are so sexy.

Christy: Really? You did?

Curtin: Yes . . . .

Curtin: I want to make you feel so good. I want this to be the best you've ever felt.

Christy: Really? You're so nice.

. . .

Curtin: Can you get undressed?

Christy: No way. My little sister comes in and out of my room a lot and she would tell Mom or Dad that I did not have any clothes on.

Curtin: Rats.

Christy: Why? What were you going to have me do?

Curtin: Play with yourself.

Christy: Oh, I never have done that kind of stuff.

Curtin: I know. I was hoping you'd start. No big thing. . . . It would just be sexy.

Christy: I'm going to feel so dumb when we are alone because I won't know what to do.

Curtin: No, you won't feel dumb. The only thing I ask is if something feels good, tell me. And if something feels bad, tell me. I just want to make you feel so good.

Christy: Okay, I will.

. . .

Curtin: I'm going to make it so good for you. I'm going to get you to come and come and come.

Christy: Will it hurt if you do that?

Curtin: No, it will feel real good. I'm not going to hurt you. Remember, I promised.

Christy: Okay. I get a little excited when I think about you being my first.

Curtin: I'm going to love sucking on your breasts, your naked body in front of me, and moving down and licking you and putting my tongue in you.

. . .

Curtin: I'd love for you to put my d . . . k in your mouth. Would you do that?

Christy: If you want me to, I think I will.

Curtin: <smiley face>.

Curtin: I'll show you how to do that to drive a guy nuts. <smiley face>.

Christy: To do what?

Curtin: Give a blow job. Put a guy's d . . . k in your mouth.

Christy: Really? You are going to teach me how to give a blow job? If my girlfriends only knew, they would be jealous.

Curtin: Sure. <smiley face>.

## D.

## The Relevancy of Curtin's Stories

[4] Under the precise circumstances of this case, and given the nature of the defense, was Curtin's immediate possession

in his PDA of material involving sexual contact with minors relevant? Our answer is "yes." *To the extent* that the stories involved sexual activity between adults and children, his possession of that material was "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. As acknowledged by the Supreme Court:

> Extrinsic acts evidence may be critical to the establishment of the truth as to a disputed issue, especially when that issue involves the actor's state of mind and the only means of ascertaining that mental state is by drawing inferences from conduct.

*Huddleston*, 485 U.S. at 685.

Relevancy boils down to what our human experiences tell us, sometimes called common sense. As explained in *McCormick on Evidence* § 185 (6th ed. 2006),

> [H]ow can a judge know whether the evidence could reasonably affect an assessment of the probability of the fact to be inferred? In some instances, scientific research may show that the fact in issue is more likely to be true (or false) when such evidence is present than when it is not. *Ordinarily, however, the answer must lie in the judge's own experience, [the judge's] general knowledge, and [the judge's] understanding of human conduct and motivation.*

(Emphasis added.)

[5] Curtin's possession in his PDA of this material at the time of his intended encounter with Christy clearly illuminated his thoughts and his subjective intent to carry out his daddy/daughter sexual initiation escapades with a juvenile, not an adult. Any lingering question of relevancy was put to

rest by Curtin's defense that it was all a fantasy to be consummated with an adult. The similarities between the email conversations and the content of the stories were readily apparent.

Moreover, the relevancy of the disputed evidence in this case has another dimension. This was not a case where the defense, relying on the government's burden of proof, simply contended that the government's evidence fell short of demonstrating the required intent beyond a reasonable doubt. Here, the defense was not merely arguing that the intent had not been proved, but rather that Curtin harbored a completely different intent than the intent required to convict; and the defense set out aggressively to establish this innocent intent in the minds of the jurors. In this regard, Curtin testified as follows:

> Q.   [Counsel for Curtin]   And can you tell us what your intent was in terms of role-playing.
>
> A.   [Curtin]   I was looking for — I had just come out of a divorce. I was — we separated last July. And I'm a person who likes being married. I enjoy the married life. I enjoy having someone I can talk to about anything.
>
> I was looking for another relationship. So, what I was looking for in the fantasy chat rooms was to find someone who was interested, at least initially, in a good sex life, but someone who is interested in a relationship, spending time together.
>
> Q.   And were you focusing on any particular people?
>
> A.   I'm — I'm not sure I understand the question.
>
> Q.   Well, is there an age group that you were focusing on?

A.   If you're asking if there's an age group of per-
sonas that I was focusing on, not really.

I was involved in some of the chat rooms, the —
some of the fantasy chat rooms where people were
representing themselves as under-age girls, girls who
have gone through puberty but haven't reached legal
age.

And as far as the actual person behind those per-
sonas, an adult female, consenting adult.

Q.   All right. And you weren't targeting young
girls?

A.   No.

Curtin bolstered his defense with six witnesses, including
two relatives (father and brother) and four business and per-
sonal friends. The common element in their collective testi-
mony was that Curtin had a reputation as a "straight arrow,"
a "boy scout," and as a person who does not drink and who
is polite, respectful, and moral. Each witness testified also that
his or her opinion of Curtin's moral character was unquali-
fiedly positive and without blemish. The clear impact of this
testimony was to imply that Curtin never would have engaged
in sexual conduct with a minor, which in turn supported his
defense of a different intent than the intent required by the
crimes charged in the indictment.

In closing argument, Curtin's counsel forcefully summed
up his factual defense of no intent as follows:

Whether the fantasies are something that you would
engage in, it doesn't matter because, once again, as
the Court has instructed you, it's protected by the
First Amendment.

Kevin gave you a list, gave you reasons why he — while engaging in this fantasy, while engaging in these types of activities, that he used persona.

He told you that the name was Kenny Huston, that he had a Kenny Huston picture, and that, indeed, the pictures showed a different individual than Kevin Curtin.

How is it different? The hair was different. The individual was thinner. The situation where he is not Kenny Huston.

And there's really a whole other persona there in terms of Christy. I mean, if you think of the reality of this situation, that you have a detective, I would assume in his 40s, likewise, engaged in the persona of a 14-year-old girl.

Kevin Curtin at that point in time tells you that, in fact, he believed that he was going to an adult place, a casino.

I'll submit to you that whether a casino has a bowling alley or whether they tried to change casinos here in marketing in Las Vegas, Nevada, in the family areas, casinos are for adults.

There's no question that casinos are for adults. If they have movie theaters or if they have the second coming of Chuck E. Cheese with an arcade or something of that nature, the fact remains that the Suncoast is a casino and an adult facility.

. . . I would submit to you, once again, that is a further indication of role-playing and as a fantasy and of a statement made on the Internet that has no credence with the type of situation that we have here.

The Government has also told you that this isn't a thought crime. And I would submit to you that this is the type of crime that is a situation where you have to look at the thoughts.

. . . And we called what we call character witnesses, individuals who have known Kevin Curtin; either his family members, friends, or business associates that deal with him on a daily basis.

**[6]** Curtin's defense makes the stuff in Curtin's possession all the more relevant because this is where the battle lines were drawn — what was in Curtin's mind as he traveled to meet Christy. Consequently, the stories were not of marginal relevance, the stories were at the core of the only material fact the defense sought to dispute. The nature of the defense heightened the probative value of the stories because they not only tended to prove Curtin's intent, but to demonstrate also that his aggressive defense was not credible. Thus, the evidence was probative both of Curtin's intent and the credibility of his innocence defense.

**[7]** Given this combination of facts, we cannot say that the district court, who was aware of the nature of this evidence and the issues at play, erred in determining that the stories in Curtin's possession contained relevant evidence of Curtin's intent. Here, the Second Circuit's relevancy analysis in *United States v. Brand*, 467 F.3d 179 (2d Cir. 2006), is instructive and persuasive. Brand was charged, as was Curtin, with traveling across state lines with the purpose of engaging in sexual acts with a minor ("Julie") in violation of 18 U.S.C. § 2423(b). *Id.* at 182. When Brand was apprehended, FBI agents found in his car suggestive pictures of young girls, and after his arrest they seized his home computer, which contained "approximately eighty images of child pornography and child erotica" along with a downloaded photograph of his prey. *Id.* at 186. The trial court admitted in evidence sixteen of the images after concluding they were relevant evidence of

Brand's intent and therefore admissible under Rule 404(b). *Id.* at 187.

On appeal, Brand argued that the district court's admission of the images was erroneous and highly prejudicial. *Id.* at 195. The government countered that the evidence was probative of Brand's intent, which was, as in the case before us, the "primary issue in dispute." *Id.* at 196. In holding that the district court did not abuse its discretion, the court noted that "in making its evidentiary rulings, the district court concluded" — as did the court here — that Brand "put his intent to commit the charged crimes at issue." *Id.* The court held,

> The images Brand possessed on his computer were relevant to determining whether, in traveling across state lines to meet "Julie" and in attempting to entice [her] , Brand intended to engage in illicit sexual activity . . . . [T]hese images provided a glimpse into Brand's sexual interest in children and, as such, were highly probative of whether he wanted to have sex with "Julie" . . . . [T]he fact that Brand had images of child pornography on his computer made it "more probable . . . than it would be without the evidence," Fed. R. Evid. 401, that Brand's intent was to travel [interstate] to engage in illicit sexual activity and to attempt to entice a minor to engage in sexual activity . . . .
>
> . . . A reasonable juror could conclude that Brand was whetting his own sexual appetite for his encounter with "Julie." A causal link between possession of child pornography and the commission of sexual crimes need not be proven conclusively for the evidence in question to be admissible. . . . [T]here is enough similarity or connection between the two so as to make the pictures on Brand's computer relevant to his intent . . . .

> . . . [T]he district court did not abuse its discretion in holding that evidence that Brand possessed child pornography was admissible under Rule 404(b) to show whether Brand's intent . . . involved an intent to engage in sexual activity with a minor . . . .

*Id.* at 197-99.

In reaching its holding, the Second Circuit relied, as do we, on the Supreme Court's instruction in *Huddleston* that

> "[e]xtrinsic acts evidence may be critical to the establishment of the truth as to a disputed issue, especially when that issue involves the actor's state of mind and the only means of ascertaining that mental state is by drawing inferences from conduct."

*Id.* at 196 (quoting *Huddleston*, 485 U.S. at 685); *see supra* Part III A.[5]

To further illustrate the relevancy of Curtin's recent PDA downloads, what would we certainly hold if the evidence in question was Curtin's possession of stories in his PDA consisting of role playing daddy/daughter incest with female adults[6] — not minors — and the district court had excluded the stories as "irrelevant"? Curtin would have attempted to admit the stories into evidence to demonstrate that he had intended to meet an adult. Without a doubt, a convicted Curtin would assert on appeal that the content of the stories shed light on his subjective intent and — as counsel put it to the jurors —

---

[5]*See also United States v. Viefhaus*, 168 F.3d 392, 397-98 (10th Cir. 1999) (approving the admission of "racist and inflammatory literature" to counter a "lack of intent" defense); *United States v. Magleby*, 241 F.3d 1306, 1318-19 (10th Cir. 2001) (affirming the admission of the lyrics of a racist song to illustrate a defendant's intent).

[6]Or, maybe the actual testimony of a woman with whom he had played daddy/daughter.

his "thoughts" as he communicated with "christy13," and as he traveled interstate with the stories in his pocket to meet her; and there is no doubt that we would agree. Why? Because the stories would have a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. Such stories would corroborate his claim of adult incest fantasy. How else could he do that without evidence of "other acts," as they are called? Conversely, the absence of such adult stories, coupled with the presence of stories wherein children are the objects of the sexual appetites of adults, is equally relevant to prove the government's case and to confront Curtin's defense.

In Internet "sting" cases such as this involving claims of entrapment, the issue of what a defendant's state of mind was immediately prior to his contact with a sexual target purporting to be a minor is routinely a serious point of contention. We call the issue one of "predisposition," and it is primarily a question of fact. In *United States v. Poehlman*, 217 F.3d 692, 695 (9th Cir. 2000), for example, Poehlman, a cross-dresser, was charged with willingly crossing state lines to have sex with minors, but it appeared that when first contacted by the government, he was looking for adults with whom to engage in his "proclivities," not children. However, the undercover officer with whom he was corresponding deftly turned Poehlman's prurient interest to children, and he responded accordingly. *Id.* at 696-97. In court, charged with a violation of 18 U.S.C. § 2423(b), Poehlman relied on his initial interest in adults to demonstrate a lack of predisposition to involve minors in his sexual plans, arguing that the government took advantage of that lawful interest and unlawfully used it to steer him to children. *Id.* at 698-99. In concluding that he had indeed been entrapped, we said, "The government thus played on Poehlman's obvious need for an adult relationship, for acceptance of his sexual proclivities and for a family, to draw him ever deeper into a sexual fantasy world involving these imaginary girls." *Id.* at 702.

To verify a factually fatal *lack* of predisposition on Poehlman's part to target minors, we looked at what was *missing* from the record that might have shown an interest in children:

> By analogy, the fact that Poehlman willingly crossed state lines to have sex with minors after his prolonged and steamy correspondence with Sharon cannot, alone, support a finding of predisposition. It is possible, after all, that it was the government's inducement that brought Poehlman to the point where he became willing to break the law. *As in [Jacobson v. United States, 503 U.S. 540 (1992)], we must consider what evidence there is as to Poehlman's state of mind prior to his contact with Sharon.*

> On this score, the record is sparse indeed; it is easier to say *what the record does not contain than what it does*. The government produced no e-mails or chat room postings where Poehlman expressed an interest in sex with children, or even the view that sex with children should be legalized. *Nor did the government produce any notes, tapes, magazines, photographs, letters or similar items which disclosed an interest in sex with children, despite a thorough search of Poehlman's home. There was no testimony from the playmates of Poehlman's children, his ex-wife or anyone else indicating that Poehlman had behaved inappropriately toward children or otherwise manifested a sexual interest in them.*

*Id.* at 703-04 (emphasis added).

[8] Thus, contextual and circumstantial evidence becomes acutely relevant to a defendant's material state of mind "prior to his contact" with the object of his sexual attention and, as *Poehlman* reveals, such evidence is not only admissible, but may be critical.

## E.

We routinely have held that circumstances surrounding an alleged crime become *more* relevant when the defendant makes his intent a disputed issue. Take the case of Larry McCollum. McCollum claimed that although he entered a bank and gave an employee a note demanding $100,000, he had no criminal intent to commit robbery because he was acting involuntarily under the influence of hypnosis. *United States v. McCollum*, 732 F.2d 1419 (9th Cir. 1984). The district court admitted a prior conviction for armed robbery to counter his defense of a lack of intent. *Id.* at 1423. We affirmed, holding:

> In this case, . . . the defense conceded that McCollum performed all acts charged by the prosecution. The key issue, indeed the only disputed issue, was whether McCollum acted with intent to rob the bank. Where the mental state to be inferred from undisputed overt acts of a defendant is the crucial issue, evidence of past criminal acts has generally been found insufficiently prejudicial to warrant exclusion.

*Id.* at 1425; *see also United States v. Verduzco*, 373 F.3d 1022, 1028 (9th Cir. 2004) (quoting *McCollum* and affirming the use of evidence of other similar criminal acts to counter an affirmative defense of duress).

The precedents discussing the use of other act evidence to establish criminal intent where intent is denied are seemingly endless. In *United States v. Brunson*, 657 F.2d 110, 115 (7th Cir. 1981), our sister circuit said,

> The remainder of appellant's contentions are equally unpersuasive. Appellant complains that the trial judge erred in admitting the Government's evidence of appellant's prior allegedly criminal conduct relating to counterfeiting after appellant had admitted

that conduct on the stand. The evidence, as stated previously, was offered and admitted in rebuttal to appellant's main defense that he did not intend to use the counterfeit money to defraud anyone. The admission for such purposes was clearly proper both because intent was a necessary element of the crime and because of appellant's chosen defense. Fed.R.Evid. 404(b); *United States v. Weidman*, 572 F.2d 1199, 1202 (7th Cir. 1978), cert. denied, 439 U.S. 821, 99 S.Ct. 87, 58 L.Ed.2d 113; *United States v. Semak*, 536 F.2d 1142, 1145 (6th Cir. 1976); *United States v. Onori*, 535 F.2d 938, 943 (5th Cir. 1976).

As the court said in the English case of *Regina v. Gill*, (1963) 1 W.L.R. 841, 846 (Crim. App.):

The accused, either by the cross-examination of the prosecution witnesses or by evidence called on his behalf, or by a combination of the two, must place before the court such material as makes duress a live issue fit and proper to be left to the jury. But, once he has succeeded in doing this, it is then for the Crown to destroy that defence in such a manner as to leave in the jury's minds no reasonable doubt that the accused cannot be absolved on the grounds of the alleged compulsion.

*Quoted in United States v. Hearst*, 563 F.2d 1331, 1336 n.2 (9th Cir. 1977) (per curiam).

## IV

### *Shymanovitz*

**[9]** We come now to the central question of whether there is something about relevant literature per se such that, as held by *Shymanovitz* and then followed by the panel in this case,

" 'possession of lawful reading material is simply not the kind of conduct contemplated by Rule 404(b).' " *Curtin*, 443 F.3d at 1091 (quoting *Shymanovitz*, 157 F.3d at 1159). After reviewing the controlling Rules as previously explained in this opinion, and the case law arising from Rules 401 and 404, we conclude that no such blanket exclusion or privilege exists. To revisit Rule 402, "all relevant evidence is admissible," except as provided by (1) the Constitution, (2) an Act of Congress, or (3) by other rules prescribed by the Supreme Court. We are unable to locate any Act of Congress or Supreme Court case or Rule or Advisory Note which would support *Shymanovitz*'s exclusion of literature as a matter of law from the reach and scope of either Rule 402 or 404(b). In fact, *Huddleston* advises us that "Congress was not nearly so concerned with the potential prejudicial effect of Rule 404(b) evidence as it was with ensuring that restrictions would not be placed on the admission of such evidence." 485 U.S. at 688-89. Moreover, we find nothing in the Constitution or in the First Amendment's guarantees of free press and free speech that would support such an exclusion or privilege. It is not surprising that the panel in *Shymanovitz* cited to no authority in support of its declaration regarding literature — none exists. Not only is there no precedent to support this holding in *Shymanovitz*, but the Supreme Court has held on many occasions in other contexts that opinions and other information that otherwise might be entitled to First Amendment protection are not immune from discovery and use as evidence in court, as long as they are relevant to an issue in a given case.

In 1989, for example, Wisconsin successfully prosecuted Todd Mitchell for aggravated battery and theft. His sentence was enhanced on the ground that he had intentionally selected his victim because of the victim's race. To provide evidentiary support for this "hate crimes" enhancement, the prosecution introduced evidence that prior to the beating, the defendant and his accomplices had discussed the racially charged movie "Mississippi Burning" and they expressed an intent to "[move] on some white people." Mitchell challenged

the sentencing enhancement in the Wisconsin Supreme Court on First Amendment grounds, arguing that the enhancement statute was overbroad because the evidentiary use of his speech would necessarily chill the freedom of expression protected by our Bill of Rights. Mitchell's argument prevailed in that forum, and the First Amendment issue made its way to the United States Supreme Court, which reversed and remanded to state court. In so doing, the Court said:

> The First Amendment, moreover, does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent. Evidence of a defendant's previous declarations or statements is commonly admitted in criminal trials subject to evidentiary rules dealing with relevancy, reliability, and the like.

*Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993). *See also Haupt v. United States*, 330 U.S. 631 (1947) (The First Amendment does not prevent the admission in evidence of a defendant's political views to demonstrate the defendant's relevant motive in a prosecution for treason).

We find another example of this principle in *Herbert v. Lando*, 441 U.S. 153 (1979). In that case, Herbert, a public figure, sued Lando for libel. *Id.* at 156. In order to attempt to prove "actual malice" on the part of Lando, as required by *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), Herbert demanded through discovery access to materials and discussions that were part of the editorial processes of *60 Minutes* and the *Atlantic Monthly* prior to the publication of the damaging stories. *Herbert*, 441 U.S. at 157 & n.2. Lando, *et al.*, refused to comply, on the ground that the First Amendment protects "against inquiry into the state of mind of those who edit, produce, or publish, and into the editorial process." *Id.* at 157. The district court disagreed with Lando. The Supreme Court agreed with the district court:

Applying the standard of Fed. Rule Civ. Proc. 26(b), which permits discovery of any matter "relevant to the subject matter involved in the pending action" if it would either be admissible in evidence or "appears reasonably calculated to lead to the discovery of admissible evidence," the District Court ruled that because the defendant's state of mind was of "central importance" to the issue of malice in the case, it was obvious that the questions were relevant and "entirely appropriate to Herbert's efforts to discover whether Lando had any reason to doubt the veracity of certain of his sources, or, equally significant, to prefer the veracity of one source over another." The District Court rejected the claim of constitutional privilege because it found nothing in the First Amendment or the relevant cases to permit or require it to increase the weight of the injured plaintiff's already heavy burden of proof by in effect creating barriers "behind which malicious publication may go undetected and unpunished."

*Id.* at 157-58 (citations omitted).

In support of this conclusion, the Court said:

It is also untenable to conclude from our cases that, although proof of the necessary state of mind could be in the form of objective circumstances from which the ultimate fact could be inferred, plaintiffs may not inquire directly from the defendants whether they knew or had reason to suspect that their damaging publication was in error.

*Id.* at 160.

Courts have traditionally admitted any direct or indirect evidence relevant to the state of mind of the defendant and necessary to defeat a conditional priv-

ilege or enhance damages. The rules are applicable to the press and to other defendants alike, and it is evident that the courts across the country have long been accepting evidence going to the editorial processes of the media without encountering constitutional objections.

*Id.* at 165 (footnotes omitted).

> We are thus being asked to modify firmly established constitutional doctrine by placing beyond the plaintiff's reach a range of direct evidence relevant to proving knowing or reckless falsehood by the publisher of an alleged libel, elements that are critical to plaintiffs such as Herbert. The case for making this modification is by no means clear and convincing, and we decline to accept it.

*Id.* at 169-70.

> Evidentiary privileges in litigation are not favored, and even those rooted in the Constitution must give way in proper circumstances. The President, for example, does not have an absolute privilege against disclosure of materials subpoenaed for a judicial proceeding. *United States v. Nixon*, 418 U.S. 683 (1974).

*Id.* at 175 (footnotes omitted).

We see the same principle — refusing to exclude relevant evidence from use as evidence in court on free speech or free press grounds — in other Supreme Court opinions. A case in point is *Branzburg v. Hayes*, 408 U.S. 665 (1972), which refused to create a First Amendment free speech and free press privilege for news reporters to protect their sources from grand jury inquiries. In a similar vein, the Court in *Zurcher v. Stanford Daily*, 436 U.S. 547 (1978), refused to exempt the

offices of a newspaper from a search with a warrant by law enforcement officers looking for evidence relevant to an investigation.

**[10]** Accordingly, if news reporters, newspapers, and television networks have no First Amendment privilege to withhold otherwise relevant evidence from the courts, and if the President of the United States himself is in the same constitutional boat, we do not believe that Curtin or anyone similarly situated can use the First Amendment or any other constitutional principle to exclude relevant evidence from the reach of Rule 401 or 404(b) on the specific ground that the evidence is "reading material" or literature otherwise within constitutional protection in another setting. We note here that the Court in *Herbert* pointed out that the material sought there could also be used *by* a defendant to *defeat* claims of actual malice, if that is what the material demonstrated — as Curtin here could have used PDA reading material evidence of daddy/*adult* daughter perversions to *support* his defense. *Herbert*, 441 U.S. at 165 n.15.

**[11]** This said, our holding here should not be interpreted as a holding (1) that the simple possession of any book or written materials generically similar to a charged crime is automatically admissible against the possessor defendant, or (2) that all pornography or obscenity in the possession of a defendant in these cases is admissible without undergoing the scrutiny required of Rules 401 and 403. In this respect, our holdings are properly limited to the facts of this case. For example, a book such as *The Great Train Robbery* would not necessarily be relevant and admissible in a run-of-the-mill theft case. On the other hand, if the crime charged happened to be theft of a money shipment from a train, then possession of the book might possibly be relevant — depending upon the precise facts and circumstances of the case. All we hold today is (1) that the information in the stories in Curtin's possession in Las Vegas when he intended to contact Christy was relevant in *this* case, (2) that the First Amendment provides no

bar to its use as evidence under these circumstances, and (3) that the district court properly exercised its discretion in so concluding. In this connection, we note that Curtin is not being prosecuted for possession of literature, but for crossing a state line with the intent to engage in sexual acts with a minor. We are confident in the ability of our trial judges to discern the difference between relevant and irrelevant written or graphic materials and that our holding will not inappropriately impinge upon or chill anyone's legitimate First Amendment rights to possess books or other written materials.

## V

## Rule 403

Curtin contends that the district court abused its discretion pursuant to Rule 403 by admitting his stories in evidence. He contends, as he steadfastly did in the district court, that the probative value of the stories is substantially outweighed by the danger of unfair prejudice. The government disputes this contention and defends the court's exercise of its responsibility pursuant to Rule 403.

Our principle problem with the government's defense is that the district court did not read every word of the five disputed stories in preparation for making its balancing decision, a fact conceded by the government during oral argument to the three-judge panel.[7] Instead, as the court went about the task of determining the admissibility of this evidence, the court read only two of the stories in full, Exhibit 7a "My Little Sister" and Exhibit 7b "Love for the World," plus blue highlighted excerpts — called "snippets" — from the other three. As for the other three stories, including "Melanie's Busy Day," the court asked for an offer of proof, which was delivered by the government. As the court said,

---

[7]When pressed on this point by the panel, the government fell back on the claim that any error was harmless, even though appellate counsel admitted he had not read the complete stories, just summaries.

> So, the only last question I had in my head is assuming that I let you introduce, in total, the first story, maybe the second one, *which was, as much as I could read, other than the snippets in the other stories*, I did have a question overnight.[8]

> I still haven't quite resolved in my mind as to whether I should let you admit the entire rest of the other stories, other than just the snippets.

(Emphasis added.) The government represented to the court that "these stories are admissible for the purpose of establishing . . . intent. The intent, the material element of the crime, of course, being that he intended to engage in sex with a minor. *The entirety of these stories relate to that, without even highlighting them.*" (Emphasis added.)

**[12]** This troubling circumstance raises a question primarily of procedure or process rather than substance: Was the trial court in this case required to have read every word of these stories when exercising its balancing discretion pursuant to Rule 403 to determine whether their potential for undue prejudice substantially outweighed their probative value? Our answer here is in the affirmative. The inflammatory nature and reprehensible nature of these abhorrent stories, although generally relevant, is such that a district court making a Rule 403 decision must know precisely what is in the stories in order for its weighing discretion to be properly exercised and entitled to deference on appeal. We see no other way for a court to make this important decision involving prejudice and redundancy, especially when the stories are such that a court finds itself unable to read all of them. In this context, reliance on an offer of proof simply is not enough.

---

[8]Earlier, the court said, "I read the first story and a little bit of the second. That's as far as I could get, which is confirming of Mr. Potter's statement [that the stories "were extremely prejudicial under a 403 type of analysis"].

The record in this case demonstrates why this must be the rule. Lurking in unread paragraph 9 of "Melanie's Busy Day," Exhibit 7C, is a particularly graphic description of "Melanie" engaged in sexual acts of mutual oral copulation with, and masturbation of, a dog. The acts described are enough to sour the stomach. Under no circumstances was this part of Exhibit 7C admissible with respect to any issue in this case. Had the district court read Exhibit 7C, the court would no doubt have spotted this excrescence and required that it be edited out of the exhibit as both irrelevant and dangerously prejudicial.

Because evidence of other crimes, wrongs, or acts carries with it the inherent potential to see the defendant simply as a bad person and then to convict because of who he is rather than what he did, a trial court must take appropriate care to see that this does not happen. The Sixth Circuit has gone so far as to mandate that a trial court considering Rule 404(b) evidence automatically conduct a Rule 403 analysis prior to determining admissibility. As explained in *United States v. Merriweather*, 78 F.3d 1070 (6th Cir. 1996), Rule 404(b) is properly applied as follows:

> Upon objection by the defendant, the proponent of the evidence, usually the government, should be required to identify the *specific* purpose or purposes for which the government offers the evidence of "other crimes, wrongs, or acts." By so requiring, we do not mandate hypertechnicality. It is true that whether 404(b) evidence is admissible for a particular purpose will sometimes be unclear until late in the trial because whether a fact is "in issue" often depends on the defendant's theory and the proofs as they develop. Nevertheless, the government's purpose in introducing the evidence must be to prove a fact that the defendant has placed, or conceivably will place, in issue, or a fact that the statutory elements obligate the government to prove.

> After requiring the proponent to identify the specific purpose for which the evidence is offered, the district court must determine whether the identified purpose, whether to prove *motive* or *intent* or *identity* [or] some other purpose, is "material"; that is, whether it is "in issue" in the case. If the court finds it is, the court must *then* determine, before admitting the other acts evidence, whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice under Rule 403. If the evidence satisfies Rule 403, then, after receiving the evidence, the district court must "clearly, simply, and correctly" instruct the jury as to the *specific* purpose for which they may consider the evidence.

*Id.* at 1076-77. Our sister circuit's rule highlights the critical importance of a Rule 403 analysis in the pursuit of a defendant's right to a fair trial.

**[13]** The Supreme Court in *Bollenbach v. United States*, 326 U.S. 607 (1945), has instructed us that " '[i]n a trial by jury in a federal court, the judge is not a mere moderator, but is the governor of the trial for the purpose of assuring its proper conduct and of determining questions of law.' " *Id.* at 612 (quoting *Quercia v. United States*, 289 U.S. 466, 469 (1933)). In this light, we hold as a matter of law that a court does not properly exercise its balancing discretion under Rule 403 when it fails to place on the scales and personally examine and evaluate *all* that it must weigh. Relying only on the descriptions of adversary counsel is insufficient to ensure that a defendant receives the due process and fair trial to which he is entitled under our Constitution, as this case demonstrates.[9] One cannot evaluate in a Rule 403 context what one has not seen or read. Here, given the depraved and patently prejudicial nature of the irrelevant evidence in Exhibit 7C that the

---

[9]Regrettably, neither the government nor the defense alerted the trial court to this objectionable passage in Exhibit 7C.

court overlooked, we are unable to conclude — as the government would have us do — that this error was harmless.

The record shows that in all other respects, the court was sensitive to Rule 403 and went to great lengths to protect the defendant's rights. The court pared down the government's attempt to offer 144 stories to just 5, and the court held the government's feet to the fire on the limited specific purpose for which the evidence was being admitted, correctly instructing the jury in the process as required by Rule 105.

Because this case is returning to the district court for retrial, we respectfully note that the court would do well to not only read each of the stories under consideration from start to finish, but also assiduously to reevaluate their unedited admissibility in the light of Rule 403's concerns about redundancy. The government's attempt to introduce 144 of these stories was clearly an exercise in overkill, but even the five stories remaining in the case convey in them more to the jury than is necessary for the government adequately to make its point. Unless objected to by the defense, careful editing of the stories would seem to be appropriate. We leave this task to the good offices of the district court.

# VI

## Conclusion

**[14]** The district court did not abuse its discretion in concluding that the stories in Curtin's PDA in his possession at the time of his arrest contained relevant evidence pursuant to Rule 404(b) insofar as they related to sexual acts between adults and minors. This evidence in this case had probative value with respect to the intent element of the specific intent crime for which he was prosecuted. The district court properly required the prosecution to demonstrate the evidence's connection to the crime with which Curtin was charged. Having determined that the evidence was relevant to show intent, the

district court's remaining responsibility was carefully to limit the evidence to avoid a violation of Rule 403, i.e., to ensure that the evidence's potentially prejudicial effect did not substantially outweigh its probative value. Here, the court's discretion was not properly exercised.

**REVERSED and REMANDED.**

---

KLEINFELD, Circuit Judge, with whom PREGERSON, KOZINSKI, THOMAS, and BERZON, Circuit Judges, join, concurring:

I concur in the reversal of Curtin's conviction. I agree with the majority that a trial judge must examine evidence in order to weigh its probative value against the potential for unfair prejudice, but disagree about whether the stories in question were relevant and admissible to show intent.

We ought to be wary when the government wants to use what people read against them. Our freedom to read and think requires a high wall restricting official scrutiny. The government (or others) can smear people by revealing what books they buy and borrow from the library, what magazines they purchase at the newsstand, what movies they rent at the video store,[1] and what they look at on the internet. And not just for

---

[1] Congress has made actionable "wrongful disclosure of video tape rental or sale records." 18 U.S.C. § 2710. "The impetus for enacting the measure arose as a result of Judge Robert Bork's 1987 Supreme Court nomination battle, during which a Washington, D.C. newspaper obtained a list of 146 video tapes the Bork family had previously rented from their neighborhood store. Members of the Senate Judiciary Committee were outraged by the invasion into the Bork family's privacy. Both houses of Congress acted quickly to outlaw certain disclosures of such clearly private information, resulting in the Videotape Privacy Protection Act." *Dirkes v. Borough of Runnemede*, 936 F. Supp. 235, 238 (D.N.J. 1996) (citing S. Rep. No. 100-599, 100th Cong., 2d Sess. at 16 (1988)).

smut. Can the government introduce a defendant's copy of *The Monkey Wrench Gang*,[2] *Lolita*,[3] or *Junky*,[4] to prove intent? DVDs of *The Thomas Crown Affair* to prove intent to rob a bank,[5] or *Dirty Harry* to prove intent to deprive someone of civil rights?[6] *Huckleberry Finn* (with quotes out of context) to prove hate crime motivation? In the 1950s, people with leftist books sometimes shelved them spine to the wall, out of fear that visitors would see and report them. Perhaps these days they would shelve *Huckleberry Finn* or *The Monkey Wrench Gang* spine to the wall. Readers should not have to hide what they read to be safe from the government.

There is no avoiding the First Amendment implications of using what people read as evidence of what they did. The Constitution has long protected our private papers and thoughts, even those entirely lacking in social value. "If the First Amendment means anything, it means that a State has no business telling a man, sitting alone in his own house, what books he may read or what films he may watch. Our whole constitutional heritage rebels at the thought of giving government the power to control men's minds."[7] So, in *Stanley v. Georgia*, the Supreme Court held the First Amendment prohibits the government from policing the private possession of obscenity.[8] *Stanley* was decided on the basis that the material was obscene, not merely pornographic, so as a matter of law the First Amendment protects private reading material even if

[2]Edward Abbey, *The Monkey Wrench Gang* (1975).

[3]Vladimir Nabokov, *Lolita* (1955).

[4]William S. Burroughs, *Junky: Originally Published as Junkie Under the Pen Name of William Lee* (1977).

[5]*The Thomas Crown Affair* (United Artists 1968) *and The Thomas Crown Affair* (Metro-Goldwyn-Mayer 1999).

[6]*Dirty Harry* (Warner Bros. 1971).

[7]*Stanley v. Georgia*, 394 U.S. 557, 565 (1969).

[8]"We hold that the First and Fourteenth Amendments prohibit making mere private possession of obscene material a crime." *Id*. at 568.

the material itself is not protected speech because it is obscene.

Fantasy is constitutionally protected. "Whatever the power of the state to control public dissemination of ideas inimical to the public morality, it cannot constitutionally premise legislation on the desirability of controlling a person's private thoughts."[9] Likewise, in *Jacobson v. United States* the Supreme Court held a person's inclinations and 'fantasies . . . are his own and beyond the reach of government.' "[10]

Based on *Stanley* and *Jacobson*, Curtin had a First Amendment right to possess and read the disgusting stories he downloaded from the internet and to fantasize about the criminal sexual conduct they describe. He emphatically did not have a right to attempt to persuade a person under 18 to have sex with him[11] or to travel from California to Nevada "for the purpose" of having sex with a person under 18.[12] The trial court should have managed the admission of evidence so as to allow the government to prove Curtin's intent and purpose, but protect him from being convicted for his execrable taste in reading material and repulsive fantasies.

The social evil Congress hoped to prevent, child molestation, never happened. It couldn't have, because there was no child. "Christy13" was an adult FBI agent. Curtin was charged with attempting to persuade a person under 18 to engage in sexual activity,[13] and travelling in interstate com-

---

[9]*Id*. at 566.

[10]*Jacobson v. United States*, 503 U.S. 540, 551-52 (1992) (omission in original) (quoting *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 67 (1973)).

[11]18 U.S.C. § 2422(b).

[12]18 U.S.C. § 2423(b).

[13]18 U.S.C. § 2422(b).

merce for the purpose of engaging in sexual activity with a person under 18.[14]

Curtin was a would-be child molester if he really thought christy13 was 13 or 14 years old and really intended to have sex with her. The only disputed issues in the case were whether he really believed christy13 was a 13 or 14 year old girl, and really had an intention to have sexual relations with her. He readily admitted fantasizing about sex with young girls, but strenuously denied that he intended to do so. According to Curtin, he hoped christy13 was a woman in her thirties who entertained the complementary fantasy of imagining herself a young girl having sex with an older man.

The stories should have been excluded (and reading matter generally ought to be excluded) for lack of relevance. That is what we held in *Guam v. Shymanovitz*,[15] and there is no good reason to overrule our own precedent.

This is not to say that all reading material is irrelevant in all circumstances. *Shymanovitz* does not create a rigid barrier against the introduction of reading material. Sometimes literature may be relevant and the probative value of evidence a defendant possessed certain reading material may exceed the prejudicial effect of admission. If a person is accused of planting a sophisticated bomb on a train, his possession of an instruction manual and the train schedule might tend to prove his guilt. Likewise, evidence that an accused contract killer owns a copy of *Hit Man: A Technical Manual for Indepen-*

---

[14]18 U.S.C. § 2423(b). The statute is broad, and it is not apparent why it would not apply to a college freshman arranging a date and driving across state lines intending to have sex with a 17 year old high school senior boyfriend or girlfriend. Could *Playboy* or *Cosmopolitan* be introduced to prove sexual intent?

[15]*Guam v. Shymanovitz*, 157 F.3d 1154, 1158 (9th Cir. 1998).

*dent Contractors* has been held to be sufficiently probative to outweigh any unfair prejudice.[16]

But Curtin's stories are not a how-to manual. They are fantasy. Fantasy is not reality. It is generally the case that, as *Shymanovitz* holds, "[t]he mere possession of reading material that describes a particular type of activity makes it neither more nor less likely that a defendant would intentionally engage in the conduct described and thus fails to meet the test of relevancy under Rule 401."[17] Barring exceptional circumstances, such as instructions for committing a crime otherwise hard to accomplish, used against one who accomplished it,[18] what people read or fantasize should not be used to prove what they intend to do. *Shymanovitz* explained that the possession of male homosexual pornography tended to prove that the defendant "had an interest in looking at gay male pornography, reading gay male erotica, or perhaps even, reading erotic stories about men engaging in sex with underage boys."[19] It did not prove "that he actually engaged in, or even had a propensity to engage in, any sexual conduct of any kind."[20]

The majority errs by confusing fantasy with intent. Mental states that would be criminal if carried out include "fantasying, wishing, desiring, wanting, intending — a continuum."[21] The statutes at issue in this case, like most criminal statutes, require intent, not mere fantasy. The link between fantasy and intent is too tenuous for fantasy to be probative. People commonly fantasize about doing things they have no intention of actually doing, or even firmly intend not to do. One may fan-

---

[16]*See Rice v. Paladin Enters.*, 128 F.3d 233, 252 (4th Cir. 1997).

[17]*Guam v. Shymanovitz*, 157 F.3d 1154, 1158 (9th Cir. 1998).

[18]*See* Eugene Volokh, *Crime-Facilitating Speech*, 57 Stan. L. Rev. 1095, 1129 (2005).

[19]*Guam v. Shymanovitz*, 157 F.3d 1154, 1159 (9th Cir. 1998).

[20]*Id.* (emphasis removed).

[21]Gerald Dworkin & David Blumenfeld, *Punishment for Intentions*, 75 Mind 396, 401 (1966).

tasize about riding a motorcycle across the country, but firmly intend never to do it because of the time, physical exertion and discomfort, and risk of injury. People go to psychiatrists for treatment of troubling fantasies that they want to avoid acting on, such as suicide. Johnny Cash probably could not have written *Folsom Prison Blues* without imagining himself a murderer imprisoned for life — "I shot a man in Reno, just to watch him die"[22] — but there is no reason to suppose that he ever intended murder in real life.

No doubt some people commit sex crimes because they want to turn their fantasies into reality, but most people with criminal fantasies probably refrain from acting on them, because they know it would be wrong, or because they do not want to risk the penalties. And some people probably commit sex crimes without fantasizing about them at all, because their minds are addled by drugs or alcohol. "Evidence of predisposition to do what once was lawful is not, by itself, sufficient to show predisposition to do what is now illegal, for there is a common understanding that most people obey the law even when they disapprove of it."[23]

In this case, there are two additional reasons why Rule 401 was not satisfied. First, there was no evidence that Curtin had read the stories used against him. According to his testimony, he downloaded 147 stories, combined in a single .zip file. The prosecutor never asked Curtin whether he actually read the five stories admitted. And we cannot assume he did, because of the volume of material. The five stories admitted vary from 12 to 36 pages single-spaced, an average of 20.4 pages. If they are representative, Curtin had to plow through 2,998 single-spaced pages of this garbage to have read them all, three times the length of *War and Peace*. The content of the stories cannot be relevant to show what was in Curtin's mind without foundation to support an inference that he read them.

---

[22]Johnny Cash, *Folsom Prison Blues* (1956).

[23]*Jacobson v. United States*, 503 U.S. 540, 551 (1992).

Second, the stories describe a different fantasy from what Curtin was charged with intending to do. All five stories admitted into evidence were about incest. They describe sexual relations between fathers and daughters, mothers and sons, mothers and daughters, and uncles and nieces. Curtin was not charged with incest. He was charged with traveling in interstate commerce with the intent of sexually abusing a person under 18. If christy13 were real, sex with her would be a crime, but it would not be incest. Even if proving a person's sexual fantasy were relevant to show an intention to carry it out, a doubtful proposition, it would not be relevant to show conduct quite different from the fantasy.

*Wisconsin v. Mitchell*,[24] the majority's primary authority for overruling *Shymanovitz*, does not stand for the proposition that a person's reading material, by itself, can be used to prove a criminal purpose. Mitchell's viewing of *Mississippi Burning* did not prove he was racially motivated; it was his discussion with friends, where he clearly rejected the movie's message, that did so.[25] The free press cases the majority cites, *Herbert v. Lando*,[26] *Branzburg v. Hayes*,[27] and *Zurcher v. Stanford Daily*,[28] amount to a collection of quotations out of context. Using a reporter's materials to prove that he had actual knowledge of the falsity of what was published, the *Lando* issue, has nothing to do with using what someone reads to prove intent. Even in a wartime treason case, *Haupt v. United States*, the Supreme Court held the government could introduce what a defendant said to prove his treasonous intentions, not what he merely read.[29]

---

[24]*Wisconsin v. Mitchell*, 508 U.S. 476 (1993).

[25]*Id.* at 480.

[26]*Herbert v. Lando*, 441 U.S. 153 (1979).

[27]*Branzburg v. Hayes*, 408 U.S. 665 (1972).

[28]*Zurcher v. Stanford Daily*, 436 U.S. 547 (1978).

[29]*Haupt v. United States*, 330 U.S. 631, 642 (1947).

Even if we assume, *arguendo*, that the stories were relevant to support an inference of intent, they would still have to be excluded under Federal Rules of Evidence 403 and 404.

Rule 404(a) prohibits admitting evidence to prove "action in conformity" with a "trait of character."[30] Perverse sexual desire is a trait of character. Using a person's perverse sexual fantasies to prove action in conformity therewith is exactly what subsection (a) of Rule 404 prohibits. The exceptions in subsection (b), "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident,"[31] are not a meaningless litany that deletes subsection (a). The stories admitted against Curtin were not a guide, fictional or otherwise, to arranging a tryst for sex with a minor. They shed no light on his motives, intentions, or plans. Good prosecution proves that the defendant committed the crime. Bad prosecution proves that the defendant is so repulsive he ought to be convicted whether he committed it or not. Rule 404(a) prevents this sort of bad prosecution. We held in *Shymanovitz* that "possession of lawful reading material is simply not the type of conduct contemplated by Rule 404(b),"[32] and we should follow our precedent. A jury is entitled to decide the truth, without having the window it looks through covered with slime.

I agree with the majority that Federal Rule of Evidence 403 requires reversal, regardless of whether Rules 401 and 404 do. The district court erred in purporting to exercise its discretion to decide whether the stories were unfairly prejudicial without reading them.

---

[30]"Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion." Fed. R. Evid. 404(a).

[31]Fed. R. Evid. 404(b).

[32]*Guam v. Shymanovitz*, 157 F.3d 1154, 1159 (9th Cir. 1998).

The stories would have to be excluded in this case even if the judge had read them. Rule 403 "prohibits evidence whose 'probative value is substantially outweighed by the danger of unfair prejudice.' "[33] "The term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged."[34] Evidence is unduly prejudicial if it creates "a genuine risk that the emotions of the jury will be excited to irrational behavior" and "this risk is disproportionate to the probative value of the offered evidence."[35] "Where the evidence is of very slight (if any) probative value, it's an abuse of discretion to admit it if there's even a modest likelihood of unfair prejudice or a small risk of misleading the jury."[36] Accordingly, trial courts should exclude marginally relevant but extremely prejudicial evidence.[37]

Prejudice is "unfair" if it has an "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."[38] Even normal biological functions induce disgust when exposed to public view. Perverse sexual fantasies generate even more intense disgust. "We accept without need of extensive argument that implications of child molestation, homosexuality, and abuse of women unfairly prejudice a defendant."[39] In *United States v.*

---

[33]*United States v. Gonzalez-Flores*, 418 F.3d 1093, 1098 (9th Cir. 2005)(quoting Rule 403).

[34]*Old Chief v. United States*, 519 U.S. 172, 180 (1997).

[35]*United States v. Ham*, 998 F.2d 1247, 1252 (4th Cir. 1993) (quoting *United States v. Masters*, 622 F.2d 83, 87 (4th Cir. 1980)).

[36]*United States v. Gonzalez-Flores*, 418 F.3d 1093, 1098 (9th Cir. 2005) (quoting *United States v. Hitt*, 981 F.2d 422, 424 (9th Cir. 1992)).

[37]*See, e.g.*, *United States v. Gillespie*, 852 F.2d 475, 479 (9th Cir. 1988) ("Evidence of homosexuality is extremely prejudicial.").

[38]Fed. R. Evid. 403 advisory committee's note.

[39]*United States v. Ham*, 998 F.2d 1247, 1252 (4th Cir. 1993) (footnote omitted).

*Harvey*, the Second Circuit held the admission of testimony concerning videotapes depicting "people performing gross acts involving human waste, and people engaging in bestiality and sadomasochism" created "disgust and antagonism" toward the defendant, "and resulted in overwhelming prejudice against him."[40] And in *United States v. Grimes*, the Fifth Circuit excluded stories as unfairly prejudicial because they were "vile in their graphic and violent nature: young girls in chains, a young girl in handcuffs, and references to blood, for example."[41]

Curtin's stories were used to make him disgusting to the jury. They portray every variety of incest. "[I]ncest has had a rare power to disgust."[42] Their strong tendency to produce disgust outweighs any probative value they might have to prove an intention to have (non-incestuous) sex with a person under 18. I disagree with the majority's suggestion that the district court can cure this unfair prejudice by redacting parts of the stories, including the bestiality in one of the stories. Excluding this material might make the stories marginally less nauseating, and thus marginally less prejudicial. But it would also make the stories appear more relevant than they actually are, and thus amplify the prejudice of admitting them at all.

I agree with the majority that the district court's error was so prejudicial we cannot deem it harmless. When we discover a non-constitutional error, "[w]e must reverse unless there is a 'fair assurance' of harmlessness or, stated otherwise, unless it is more probable than not that the error did not materially affect the verdict."[43] The jury could certainly have convicted Curtin, based on the emails and his arrival at the bowling alley. Alternatively, the jury could have believed Curtin's

---

[40]*United States v. Harvey*, 991 F.2d 981, 996 (2d Cir. 1993).

[41]*United States v. Grimes*, 244 F.3d 375, 385 (5th Cir. 2001).

[42]Richard A. Posner, *Sex and Reason* 201 (1994).

[43]*United States v. Morales*, 108 F.3d 1031, 1040 (9th Cir. 1997) (en banc) (citation omitted).

account and acquitted. He testified that he never believed christy13 was really 13 or 14, because most people in internet chat rooms are role-playing. Also, christy13 said she had never kissed a boy or talked about sex with her friends, which he thought unlikely. His account may strike us as unlikely, but we are not the jury. He is entitled to have a jury decide in a fair trial whether he committed the crime charged.

The law of evidence affects what kind of a country we live in. Fantasies and dreams are not intentions, or close to them. The reading material people get from libraries, bookstores, newsstands, and the internet should generally not be used to prove that they intended to do what it portrays, because such evidentiary use "would compel *all* persons to choose the contents of their libraries with considerable care; for it is the innocent, and not just the guilty, who are sometimes the subject of good-faith prosecutions."[44] However repulsive a person's dreams or fantasies may be, they offer little support for an inference of an intention to act on them. According to Blackstone, "the tyrant Dionysius is recorded to have executed a subject, barely for dreaming that he had killed him; which was held for a sufficient proof, that he had thought thereof in his waking hours. But such is not the temper of English law."[45] Nor should it be the temper of ours.

---

McKEOWN, Circuit Judge, with whom PREGERSON, KOZINSKI, THOMAS, and BERZON, Circuit Judges, join, concurring:

All fifteen judges on the en banc court agree on one undisputed fact and on the single reason to remand this case: the district judge did not read all of the pornographic stories

---

[44]*Guam v. Shymanovitz*, 157 F.3d 1154, 1159 (9th Cir. 1998) (emphasis in original).

[45]William Blackstone, 4 *Commentaries* *79.

admitted into evidence to weigh their probative value against the potential for unfair prejudice. Nothing more needs to be said.

Instead of simply stopping at deciding the case, the majority goes on at length about whether to overrule *Guam v. Shymanovitz*, 157 F.3d 1154 (9th Cir. 1998), which has nothing to do with the failure to review the evidence, and speculates about how the Federal Rules of Evidence might play out on remand. The bulk of the majority's discourse is dicta. *See United States v. Henderson*, 961 F.2d 880, 882 (9th Cir. 1992) (defining dicta as language that is "unnecessary to [the court's] holding"). Once the case goes back to the district court, we don't know how it will be resolved. Maybe there will be a plea. Or, if there is a retrial, we don't know what evidence the prosecutor will offer or how the district court will rule. Indeed, after this appeal, the prosecution may well reevaluate the need or admissibility of these salacious stories. Nonetheless, the majority offers a far-ranging discourse on Rules 401, 403, and 404, among other matters.

The case can be resolved on a simple principle. I see no reason to go further. Not surprisingly, the breadth of the majority's opinion prompted Judge Kleinfeld's thoughtful concurrence, which expresses concerns that I share.

---

WARDLAW, Circuit Judge, concurring:

I concur only in the result. On the record before us, I cannot say that the district court abused its discretion by finding *some portions* of five recently downloaded stories that Curtin had in his possession relevant and admissible to show motive and intent. The district court erred, however, by failing to determine which portions of the stories it deemed relevant. It further abused its discretion by failing to conduct a proper Rule 403 analysis. And, unlike some of my colleagues, I do not

read *Guam v. Shymanovitz*, 157 F.3d 1154 (9th Cir. 1998), to hold that the possession of lawful reading material is never admissible to prove intent under any circumstances.

Notwithstanding the Rule 403 error, the district court's limiting instructions were extensive and necessary here to cabin the jury's consideration to the relevant aspects of the admitted stories. The court emphasized, "No one can be convicted for simply their proclivity or thoughts." This directive recognized the very real concerns Judge Kleinfeld discusses in his concurrence, which I share. Through it, the district court properly sought to restrain the jury from going down the path of Big Brother.

The use of lawful reading material to prove intent is a dangerous business, and any district court that considers admitting such evidence should carefully weigh both its relevance and the concerns embodied in Rule 403. What is clear from the record is that the district court did not read the entirety of the five stories that it admitted into evidence and gave to the jury. The district court certainly did not consider the relevance of each story in tandem with a proper Rule 403 analysis for both prejudice and cumulative evidence. I would therefore reverse and remand. Upon retrial, the district court should reevaluate each of the stories in its entirety to determine which portions are relevant, as well as which portions, though relevant, must be excluded under Rule 403.