# IN THE SUPREME COURT OF IOWA

No. 12–0022

Filed June 13, 2014
Amended August 26, 2014

**STATE OF IOWA,**

Appellee,

vs.

**RICKY LEE PUTMAN,**

Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Fayette County, John J. Bauercamper, Judge.

A criminal defendant seeks further review of a court of appeals decision affirming a district court's admission of prior-bad-acts evidence in the form of two video titles involving child pornography in a trial for child sex abuse. **DECISION OF COURT OF APPEALS AND JUDGMENT OF DISTRICT COURT AFFIRMED.**

Mark C. Smith, State Appellate Defender, and Stephan J. Japuntich, Assistant State Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Sheryl A. Soich, Assistant Attorney General, and W. Wayne Saur, County Attorney, for appellee.

**ZAGER, Justice.**

Ricky Lee Putman was charged with one count of first-degree sexual abuse for allegedly performing a sex act on L.R., a two-year-old girl. Putman filed a motion in limine that sought to exclude evidence of child pornography found on his computer and other electronic devices. After an evidentiary hearing, the district court denied the motion in limine, with limitations. The district court allowed the State's expert to testify at trial that child pornography was found on Putman's computer and other electronic devices. However, it limited the State's expert to testifying only to the file names of two videos. A jury convicted Putman, and he appealed, claiming the district court erred when it admitted the evidence of prior bad acts. The court of appeals affirmed. Putman sought further review, which we granted. For the reasons set forth below, we affirm his conviction.

## I. Background Facts and Proceedings.

Around 6 p.m. on May 22, 2010, forty-one-year-old Ricky Putman came to the home of Lawrence and Holley Robbins in Arlington, Iowa, to spend time with the couple and their three children. One of the children was two-year-old L.R. After joining the family on a trip to a nearby park, Putman returned with the family to their home around 9 p.m. Shortly after the group returned from the park, Holley's cousin, fifteen-year-old Alex, came to the house.

Back at the house, the adults drank beer, watched television, and listened to music while the children played. By midnight or 1 a.m., the Robbins children had fallen asleep. The two boys had fallen asleep on the couch, and L.R., wearing a blue dress and a diaper, was carried upstairs to her crib, which was located in a room just adjacent to the bedroom shared by Lawrence and Holley.

Holley spent some more time downstairs with Lawrence, Alex, and Putman before going upstairs to go to sleep. Putman followed Holley up the stairs, climbed into bed with her, and became sexually aggressive towards her. Holley got out of the bed, went downstairs followed by Putman, and told Lawrence and Alex what had just taken place. Holley demanded that Lawrence get Putman out of the house. However, this did not occur. Shortly thereafter, Holley again went back upstairs to go to bed, this time followed by Putman and Alex. Putman again crawled into bed with Holley, touched her, and told her to leave Lawrence for him. Holley immediately climbed out of bed and went downstairs a second time, this time followed by Alex and Putman. Holley left the house with Alex around 4 a.m., again telling her husband to get Putman out of the house.

Putman did not leave. Around 4:30 a.m., at Lawrence's suggestion, Putman went to sleep in Lawrence and Holley's bedroom. Lawrence, after cleaning up the downstairs, went upstairs to check on L.R. in her crib. Lawrence did not notice anything unusual at that time. He also observed Putman sleeping in his and Holley's bed. Lawrence then went downstairs and fell asleep on a chair. Lawrence awoke around 7 a.m. on May 23 when Alex's mother, Marilyn Blackford, came to the house looking for Alex.

L.R. came downstairs around 8 a.m. L.R. was not wearing her diaper or the blue dress she had been wearing the previous night. Lawrence did not think this odd as L.R. had removed her own diaper on previous occasions. While Lawrence did notice some blood between L.R.'s legs, he believed she had merely scratched herself. Lawrence put a fresh diaper on L.R. and sat her on the couch. After L.R. cried for a bottle, Lawrence went upstairs to retrieve it from her crib. While he was

upstairs, Lawrence exchanged greetings with Putman and noticed that Putman had blood on his shirt and on his hands. Lawrence believed Putman could have cut himself on a broken table beside the bed. Lawrence went back downstairs and fixed a bottle for L.R. Lawrence laid L.R. on the couch where she fell asleep, and he sat in a chair. Lawrence did notice that L.R. was lying awkwardly on the couch.

Shortly afterward, Putman came downstairs. Putman looked at the blood on his hands and clothes and asked Lawrence what had happened. Lawrence told Putman he may have cut himself on the broken table next to the bed. L.R. awoke, looked at Putman, and moved towards Lawrence. Putman then put his shoes on and left the house.

Eventually Holley returned home. When she arrived, Lawrence was upset and shaking. He told Holley that he had to go, and he went to the home of Marilyn Blackford, Holley's aunt, who lived a few houses away. While at Marilyn Blackford's house, Lawrence asked Marilyn and her boyfriend how a person would know if a child had been sexually molested. Meanwhile, while Lawrence was gone, Holley noticed bruising on L.R.'s face and neck, what she suspected to be bite marks on her ear, and blood on her chest and legs.

Lawrence returned home with Marilyn Blackford. After observing L.R., including opening up L.R.'s diaper, Marilyn Blackford instructed Lawrence and Holley to take L.R. to the hospital in Oelwein, and law enforcement would be contacted. The Robbins family went immediately to the hospital, and the Fayette County Sheriff was contacted.

After being examined at Mercy Hospital in Oelwein, it was determined that the injuries sustained by L.R. were too extensive to be properly treated there. L.R. was subsequently transferred to the University of Iowa Hospitals and Clinics for appropriate treatment. After

examinations by pediatric physicians at the University of Iowa Hospitals and Clinics, they concluded that L.R. had suffered vaginal penetration injuries. To repair those injuries, L.R. was taken to surgery and put under general anesthesia. Her injuries required numerous stitches to repair the damage.

After its preliminary investigation to secure the scene and identify possible suspects, the sheriff's department began conducting interviews in the morning hours of May 23. A sheriff's deputy went to Putman's home in Arlington. There, the deputy found Putman, who appeared to have recently showered. Putman was advised of his Miranda rights. With Putman's consent, the deputy began to collect evidence from the Putman home. It became apparent during the investigation that Putman had begun to launder some of his clothing. Ultimately seized from Putman's home was a recently laundered shirt matching the description of the one Putman was alleged to have worn the previous night.[1] The damp shirt hung from a bedroom door handle while a few other items of clothing tumbled in the dryer. The deputy decided to detain Putman.

Putman was eventually arrested and charged by trial information with sexual abuse in the first degree, a class "A" felony. While in jail, Putman, who lived alone, asked a friend, Rodney Peterman, to go to his house and feed his cat. Peterman built computers as a side business and had built and sold Putman a computer and related electronic devices. Knowing the reason Putman had been arrested, Peterman decided to see what was on Putman's computer while he was at Putman's house. On the computer, Peterman found what he suspected to be child pornography. Because of this discovery, and the fact that Putman still

---

[1]Initially, the deputy seized a different shirt that Putman represented he had been wearing the previous night.

owed him money for the computer, Peterman took the computer, which contained a CD and an external hard drive. Peterman took these items to his parents' house and called the sheriff's department. A deputy from the sheriff's department retrieved the computer, CD, and the external hard drive.

On another trip to feed Putman's cat, Peterman took more items from Putman's house. Among the items Peterman took was a box containing miscellaneous tattoo equipment that Peterman had given to Putman. Inside the box, Peterman also found a loose USB drive. Upon returning home, Peterman plugged this USB drive into his own computer. On the USB drive, Peterman found more disturbing materials, so he notified the sheriff's department and dropped off the USB drive at the sheriff's office. The computer and other electronic devices were later turned over to a unit within the Iowa Division of Criminal Investigation (DCI), the Internet Crimes Against Children Task Force. That unit performed a forensic evaluation of the computer and related electronic devices.

Before trial, Putman filed a motion in limine seeking to exclude evidence of prior bad acts. Putman asserted that any information obtained from his computer was not admissible, specifically identifying evidence of child pornography. The State also requested a ruling from the district court on the admissibility of the child pornography, citing motive and identity as potential issues in the case. The district court issued an order permitting the State to offer into evidence images of young child pornography seized from Putman's computer, per rule 5.404(b) of the Iowa Rules of Evidence. The district court ruled that such evidence of prior bad acts was relevant to the issues of identity, motive, and related issues due to the fact the defense theory of the case was that

another person committed the crime and the two-year-old victim was the only witness to the crime as it occurred. Putman then filed a motion requesting the district court reconsider its ruling on the admissibility of the child pornography evidence.

An evidentiary hearing on Putman's motion to reconsider was held. An investigator for DCI testified at the hearing regarding his investigation of the computer and other electronic devices. The DCI investigator examined the computer's hard drive, external hard drive, the USB drive, and the CD and found thousands of photographs and over one hundred videos depicting child pornography. Contained within these videos, the DCI investigator discovered two titles of special note as they specifically referenced rapes involving a two-year-old child. The DCI investigator read into the record the two videos' entire titles and confirmed the videos' titles described the videos' content.

The defense cross-examined the DCI investigator, drawing from him several points. First, the DCI investigator testified he was unable to determine whether the USB drive had ever been inserted into Putman's computer. In addition, he was unable to conclude Putman's computer had been used to copy files onto the USB drive. Next, regarding the CD, the DCI investigator could not determine that its contents had been placed on the disk using the computer. The DCI investigator also testified he was unsure whether the computer, which had multiple user accounts, was password protected. He acknowledged his investigation could not reveal who downloaded the files onto the computer or other devices. Finally, he conceded that if the computer's internal clock were altered, then a file's time stamp would be inaccurate. He knew of no way, however, to determine whether the computer's clock was accurate at the time a file was downloaded.

At the conclusion of the hearing, the State agreed not to make any mention of the child pornography in its opening statement to the jury and agreed not to display any of the seized child pornography during trial. After the hearing, the district court denied Putman's motion, finding the State had established Putman's ownership of the computer, use of the computer, and the chain of custody for the evidence. The court also found the evidence relevant and not unduly prejudicial. Finally, the court bound the State to the agreements it made during the hearing, noting the court had "relied on them in making its ruling."

At trial, the State called Peterman, who testified he built the computer for Putman and sold it to Putman. Peterman testified that when he sold the computer to Putman it did not contain child pornography. Peterman also testified regarding his discovery of the child pornography on Putman's computer and other electronic devices. The DCI investigator also testified. He explained his forensic investigation into Putman's computer and the electronic devices. He also testified he found child pornography on all four items that had been taken from Putman's house. He was allowed to mention only the two video titles, and he did not read the entire video titles to the jury, as he had at the hearing. The DCI investigator testified the video titles matched their content, estimating the girls in the videos to be two or three years of age. No pornographic images were shown to the jury. On cross-examination, the investigator testified he could not determine who was operating the computer or other electronic devices at the time when a file was generated.

Putman was convicted of one count of first-degree sexual abuse. Putman appealed on several grounds, one of which was the admission of the evidence of child pornography, including the two video titles. We

transferred the case to the court of appeals, and it affirmed Putman's conviction. Putman sought further review, which we granted to determine whether the admission of the evidence of child pornography and, specifically, the two video titles, as limited, was proper.

## II.  Issue on Further Review.

On further review, we have discretion to consider all the issues raised on appeal. *State v. Becker*, 818 N.W.2d 135, 140 (Iowa 2012). We may let the court of appeals decision on any particular issue stand as a final decision. *Id.* On further review, we address only Putman's challenge to the admission of the evidence of child pornography and the two video titles. With respect to Putman's challenge to the sufficiency of the evidence to convict him, and to the district court's exclusion of the DCI laboratory report, the court of appeals decision stands as final. *See id.* (allowing court of appeals decision to stand on an issue not addressed on further review).

## III.  Standard of Review.

We review evidentiary rulings regarding the admission of prior bad acts for abuse of discretion. *State v. Cox*, 781 N.W.2d 757, 760 (Iowa 2010). "A court abuses its discretion when its 'discretion was exercised on grounds or for reasons clearly untenable or to an extent clearly unreasonable.' " *State v. Long*, 814 N.W.2d 572, 576 (Iowa 2012) (quoting *State v. Teeters*, 487 N.W.2d 346, 349 (Iowa 1992)). " 'A ground or reason is untenable when it is not supported by substantial evidence or when it is based on an erroneous application of the law.' " *In re Det. of Stenzel*, 827 N.W.2d 690, 697 (Iowa 2013) (quoting *Ranes v. Adams Labs., Inc.*, 778 N.W.2d 677, 685 (Iowa 2010)). Even if a trial court has abused its discretion, prejudice must be shown before we will reverse. *State v. Jordan*, 779 N.W.2d 751, 756 (Iowa 2010).

**IV. Discussion.**

**A. Iowa Rule of Evidence 5.404(*b*).** This appeal turns on the admissibility of evidence of prior bad acts. Under Iowa Rule of Evidence 5.404(*b*), evidence of prior bad acts is not admissible for purposes of proving character: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith." Iowa R. Evid. 5.404(*b*). The evidence "may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.* The rule "exclude[s] evidence that serves no purpose except to show the defendant is a bad person, from which the jury is likely to infer he or she committed the crime in question." *State v. Rodriguez,* 636 N.W.2d 234, 239 (Iowa 2001).

In determining whether to admit prior-bad-acts evidence, we rely on a three-step analysis.[2] *See State v. Sullivan,* 679 N.W.2d 19, 25 (Iowa

---

[2]There has been persistent confusion in our cases about whether Iowa Rule of Evidence 5.404(*b*) requires clear proof that the person against whom the evidence is offered committed the prior bad act. In some cases, it has been suggested a showing of clear proof is required as an independent prong in the prior-bad-acts analysis, in addition to finding relevancy and weighing prejudice. In *State v. Sullivan,* we explained that clear proof and relevancy were the two "conditions" to be established before evidence could "be considered admissible." 679 N.W.2d 19, 25 (Iowa 2004). In *State v. Jones,* we concluded that, because evidence of prior bad acts was relevant and clearly proved, the trial court did not abuse its discretion in refusing to exclude it. 464 N.W.2d 241, 243 (Iowa 1990); *see also State v. Roth,* 403 N.W.2d 762, 765 (Iowa 1987) (requiring relevancy and clear proof before analyzing evidence's prejudicial effect), *abrogated on other grounds by State v. Campbell,* 714 N.W.2d 622, 630 (Iowa 2006). In *State v. Johnson,* we observed that, in addition to the relevancy requirement, "[p]roof of the other offenses must be clear" before explaining the trial court still must balance evidence's probative value against its prejudicial effect. 224 N.W.2d 617, 620, 621 (Iowa 1974); *see also Rodriguez,* 636 N.W.2d at 240 ("Since our decision in [*State v.*] *Wade,* [467 N.W.2d 283 (Iowa 1991)], we have stated that there must be 'clear proof' that the defendant committed the prior bad acts."); *State v. Brown,* 569 N.W.2d 113, 117 (Iowa 1997) (noting that "[i]n at least some cases we have added as a final consideration" the clear-proof requirement). Under this strand of cases, it is necessary that the evidence is relevant to some legitimate and disputed issue, that there is clear proof the defendant committed the prior act or crime, and that the evidence's probative

value is not substantially outweighed by the danger of unfair prejudice. *See Sullivan*, 679 N.W.2d at 25.

In other cases, however, we have evaluated whether there was clear proof as one factor in the multi-factored weighing process, not as an independent prong in the analysis. In *State v. Reynolds*, which followed *Sullivan*, we explained a court must determine whether the evidence is relevant to a disputed issue and whether the evidence's probative value is substantially outweighed by the danger of unfair prejudice *See* 765 N.W.2d 283, 289–90 (Iowa 2009). Rather than expressing the clear-proof requirement as an independent analytical step, we explained that, when a court weighs the prejudicial effect of evidence, it must consider whether there was clear proof it was the defendant who committed the prior bad act. *See id.* at 290. Other recent cases have stated the test similarly. *See, e.g.*, *State v. Henderson*, 696 N.W.2d 5, 11 (Iowa 2005) (considering the existence of clear proof as one factor in balancing process without mentioning the clear-proof requirement as an independent analytical step); *State v. Taylor*, 689 N.W.2d 116, 129–30 (Iowa 2004) (same). Earlier cases also apply the test in this fashion. *See, e.g.*, *Wade*, 467 N.W.2d at 284 (including proof the accused committed the prior act as a consideration in the balancing process, not as an independent analytical step); *State v. Plaster*, 424 N.W.2d 226, 231–32 (Iowa 1988) (considering whether the accused defendant committed the prior act as part of the balancing process). Under this strand of cases, it need only be found that the evidence is relevant to a legitimate, disputed issue and that the danger of unfair prejudice to the defendant does not substantially outweigh the evidence's probative value. *See Reynolds*, 765 N.W.2d at 290.

Some requirement of proof the actor against whom the evidence is offered committed the prior act is common. Many jurisdictions consider it as an independent analytical step. *See, e.g.*, *State v. Terrazas*, 944 P.2d 1194, 1196 (Ariz. 1997); *People v. Garner*, 806 P.2d 366, 373 (Colo. 1991); *Johnson v. United States*, 683 A.2d 1087, 1093 (D.C. 1996); *Rittenhouse v. State*, 526 S.E.2d 342, 344 (Ga. 2000); *People v. Thingvold*, 584 N.E.2d 89, 95 (Ill. 1991); *State v. Jackson*, 625 So. 2d 146, 149 (La. 1993); *State v. Faulkner*, 552 A.2d 896, 898 (Md. 1989); *Commonwealth v. Leonard*, 705 N.E.2d 247, 250 (Mass. 1999); *State v. DeWald*, 464 N.W.2d 500, 503 (Minn. 1991); *State v. Floyd*, 763 N.W.2d 91, 98 (Neb. 2009); *State v. Kirsch*, 662 A.2d 937, 942 (N.H. 1995); *State v. Hernandez*, 784 A.2d 1225, 1232 (N.J. 2001); *State v. Holder*, 676 S.E.2d 690, 698 (S.C. 2009); *Harrell v. State*, 884 S.W.2d 154, 158 (Tex. Crim. App. 1994); *State v. Pirtle*, 904 P.2d 245, 257–58 (Wash. 1995).

Still other courts take a slightly different view. In *Huddleston v. United States*, the United States Supreme Court explained the determination whether proof existed that the actor committed the prior act was subsumed under the relevancy prong of the prior-bad-acts test: "In the Rule 404(b) context, similar act evidence is relevant only if the jury can reasonably conclude that the act occurred and that the defendant was the actor." 485 U.S. 681, 689, 108 S. Ct. 1496, 1501, 99 L. Ed. 2d 771, 782 (1988). Some states take a similar view. *See, e.g.*, *State v. McDonald*, 500 N.W.2d 243, 246 (S.D. 1993) ("The strength of the evidence offered is already part of the relevancy determination."); *State v. McGinnis*, 455 S.E.2d 516, 524–25 (W. Va. 1994) ("The evidence is relevant only if the jury can reasonably infer that the act occurred and that the defendant was the actor."). In spite of our divergent caselaw, this court has explained that "the State must present clear proof that the defendant was culpable in the other acts in question" because the "[c]rimes of third persons are not relevant." *Johnson*, 224 N.W.2d at 620. Whether the proof requirement is subsumed under the

2004). A court must first determine whether the evidence is relevant to a legitimate, disputed factual issue. *Id.* Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Iowa R. Evid. 5.401. The general test of relevancy is "whether a reasonable [person] might believe the probability of the truth of the consequential fact to be different if [the person] knew of the proffered evidence." *State v. Plaster*, 424 N.W.2d 226, 229 (Iowa 1988) (citation omitted) (internal quotation marks omitted). Irrelevant evidence is, of course, inadmissible evidence. Iowa R. Evid. 5.402.

There also "must be clear proof the individual against whom the evidence is offered committed the bad act or crime." *Sullivan*, 679 N.W.2d at 25. In assessing whether clear proof of prior misconduct exists, the prior act need not be established beyond a reasonable doubt, and corroboration is unnecessary. *State v. Taylor*, 689 N.W.2d 116, 130 (Iowa 2004). "There simply needs to be sufficient proof to ' "prevent the jury from engaging in speculation or drawing inferences based on mere

---

relevancy prong or is viewed as an independent prong, the party offering the evidence must still show sufficient proof the actor against whom the evidence is offered committed the act before a court weighs prejudice. Thus, the result of failing to show sufficient proof will be functionally the same, and the court will not need to weigh the danger of unfair prejudice against its probative value. *Cf. Sullivan*, 679 N.W.2d at 29 (finding evidence of prior bad acts not relevant to a noncharacter purpose and thus not weighing prejudice against probative value).

After reviewing our cases and the diverse approaches of other jurisdictions, we conclude the better approach is to require, as an independent prong in the prior-bad-acts analysis, "clear proof the individual against whom the evidence is offered committed the prior" act or crime. *Jones*, 464 N.W.2d at 243. Requiring clear proof accords a defendant protection from the "concern that unduly prejudicial evidence might be introduced under [r]ule [5.404(*b*)]." *Huddleston*, 485 U.S. at 691, 108 S. Ct. at 1502, 99 L. Ed. 2d at 783. Moreover, expressing the requirement of clear proof as an independent prong makes the prior-bad-acts test easier for trial courts and juries to apply. Notably, in this case, the trial court instructed the jury the evidence of two videos on Putman's computer must have been shown by clear proof.

suspicion." ' " *Id.* (quoting *State v. Brown*, 569 N.W.2d 113, 117 (Iowa 1997)). Testimony of credible witnesses can satisfy the clear-proof requirement. *See Rodriguez*, 636 N.W.2d at 243 (concluding testimony of two witnesses was sufficient to support a finding of clear proof).

If the evidence is relevant to a legitimate and disputed factual issue, and the clear-proof requirement is satisfied, the court must determine whether the evidence's "probative value is substantially outweighed by the danger of unfair prejudice to the defendant." *Sullivan*, 679 N.W.2d at 25. We consider a series of factors in weighing probative value against the danger of unfair prejudice. *See, e.g., State v. Martin*, 704 N.W.2d 665, 672–73 (Iowa 2005) (applying factors to analyze whether the danger of unfair prejudice substantially outweighed probative value). We consider

> the need for the evidence in light of the issues and the other evidence available to the prosecution, whether there is clear proof the defendant committed the prior bad acts, the strength or weakness of the evidence on the relevant issue, and the degree to which the fact finder will be prompted to decide the case on an improper basis.

*Taylor*, 689 N.W.2d at 124. If the danger of the evidence's prejudicial effect substantially outweighs its probative value, the evidence must be excluded. *See State v. Henderson*, 696 N.W.2d 5, 12 (Iowa 2005) (holding district court abused its discretion in admitting prejudicial prior-bad-acts evidence). Weighing probative value against prejudicial effect "is not an exact science," so "we give a great deal of leeway to the trial judge who must make this judgment call." *State v. Newell*, 710 N.W.2d 6, 20–21 (Iowa 2006).

**B. Relevancy.** Putman first attacks the purpose for which the two video titles were admitted. He argues the evidence served no purpose other than to prove he acted in conformity with his character.

In response, the State insists the evidence served to show Putman's motive and identity as the perpetrator, which it claims, were disputed factual issues in the case.

The State advances motive as its first noncharacter purpose for admitting the child pornography video titles. "*Motive* is the impetus that supplies the reason for a person to commit a criminal act." 2 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 404.22[3], at 404-119 to 404-120 (Joseph M. McLaughlin ed., 2d. ed. 2014); *see also State v. Richards*, 809 N.W.2d 80, 92 (Iowa 2012) (describing motive as the reason why a defendant would have committed murder). We have observed, for example, that revenge and avoiding criminal charges may be motives for committing a crime. *See, e.g., State v. Barnes*, 791 N.W.2d 817, 827 (Iowa 2010) (finding evidence of defendant's desire to "get back at" his sister probative of his motive to steal his sister's property); *State v. Nelson*, 791 N.W.2d 414, 425–26 (Iowa 2010) (finding evidence of drug dealing relevant to accused murderer's motive because a drug dealer would be more likely to shoot a buyer if the drug dealer believed the buyer was an undercover police officer). Motive, like any other noncharacter purpose for which evidence might be offered, must have been at issue in the case. *See Taylor*, 689 N.W.2d at 124 (explaining that the first step in the prior-bad-acts analysis is identifying whether the noncharacter purpose is at issue in the case).

The perpetrator's motive for sexually abusing L.R. was not a legitimate or disputed issue in this case. The State was not required to prove Putman's state of mind as an element of the crime, and Putman's state of mind at the time of the crime was not put in issue. *See Newell*, 710 N.W.2d at 21 (discussing elements of first-degree murder and the

need for evidence on the defendant's state of mind at the time of the crime in making a relevancy determination). The evidence of child pornography therefore could not be admitted for the purpose of proving Putman's motive.

The State further advanced identity as a noncharacter purpose for admitting the child pornography evidence. It is thus essential to decide whether identity was at issue in this case. *Cf. Taylor*, 689 N.W.2d at 124 (holding court must determine whether intent, a nonpropensity purpose, was at issue in the case). Identity of the perpetrator was clearly the primary issue in the case. The State was required to prove beyond a reasonable doubt that Putman sexually abused L.R. *Cf. id.* (examining the first-degree-burglary statute to decide whether intent was at issue). Moreover, identity was the only disputed issue in the case as the defense sought to shift responsibility for the crime onto the victim's father, Lawrence Robbins. *See Cox*, 781 N.W.2d at 771 (explaining identity may be put in issue "[w]hen a defendant argues a crime was committed by another person"). Accordingly, we reject Putman's contention the State offered the evidence for no purpose other than to prove he was a bad person and that he acted in conformity with his character.

In cases in which evidence of prior bad acts is offered for the purpose of proving identity, we have imposed a more demanding test than the general relevancy test. *See, e.g., State v. Butler*, 415 N.W.2d 634, 636 (Iowa 1987) (holding rare burglar's tool used by the defendant in previous crimes and the tool used in the case on appeal were sufficiently similar to permit prior-bad-acts evidence for the purpose of proving identity); *State v. Walsh*, 318 N.W.2d 184, 186–87 (Iowa 1982) (finding sufficient similarity between circumstances of a homicide the defendant was previously convicted of and the homicide for which

defendant was on trial to admit evidence for the purpose of proving identity). "To permit the inference that similar acts establish the same person committed both acts, we have required that the other acts must be 'strikingly similar' or of a 'unique nature.'" *In re J.A.L.*, 694 N.W.2d 748, 753 (Iowa 2005) (quoting *State v. Barrett*, 401 N.W.2d 184, 189 (Iowa 1987)).

We acknowledge the difference, in broad terms, between Putman's act of allegedly possessing child pornography and the act for which he was on trial, sexual abuse of a child. Strictly applying the requirement of similarity between prior acts and the act for which the defendant was on trial, one court noted the "wide gulf" separating "the act of *possessing* written descriptions or stories about criminal conduct from the act of *committing* the offenses described." *See People v. Shymanovitz*, 157 F.3d 1154, 1159–60 (9th Cir. 1998) (holding trial court abused its discretion in admitting magazine articles as prior-bad-acts evidence), *overruled in part by United State v. Curtin*, 489 F.3d 935, 943 n.3 ("Prior acts evidence admitted under Rule 404(b) . . . [requires] 'some connection' between the reason for introducing the prior act and the nature of the crimes charged. Any language in *Shymanovitz* to the contrary is disapproved."). This court, however, has not applied the similarity requirement so strictly.

We have evaluated similarity by comparing the contents of materials possessed by a defendant to a criminal act committed by the defendant. *See, e.g., Barrett*, 401 N.W.2d at 189 (comparing "rather sketchy plans" in the defendant's journal to homicides for which the defendant was being tried). In *J.A.L.*, for example, a juvenile faced a delinquency adjudication for falsely reporting placement of an explosive device in his school. 694 N.W.2d at 750. We analyzed whether the

juvenile court should have admitted the defendant's journal entries, which revealed the juvenile's fascination with "suicide, death, and murder," in spite of the broad dissimilarity between the act of placing a bomb threat at a school and authoring or possessing a macabre diary. *See id.* at 753. Though we held the journal entries should not have been admitted, it was because the journal topics did not contain "plans to place a bomb threat or to kill any of his fellow students," not because journaling, or possessing a journal, lacks striking similarity with the act of placing a bomb threat. *See id.* Thus, when assessing the relevancy of prior-bad-acts evidence, we look not only for similarities between two acts committed by the defendant, but also for similarities between contents of materials possessed by the defendant and acts committed by the defendant. *See id.*

Our criminal cases evaluating prior-bad-acts evidence are of two general categories. One category is cases in which there are only general similarities between the prior bad act and the crime for which the defendant is being tried. *See, e.g.*, *Cox*, 781 N.W.2d at 759–60 (identifying " 'common threads' " between prior acts of sexual abuse and the acts the defendant was being tried for); *J.A.L.*, 694 N.W.2d at 753 (comparing a preoccupation with death in a journal to threats to bomb a school); *Barrett*, 401 N.W.2d at 189 (comparing plans to kill a newspaper carrier contained in the defendant's journal to the life-insurance-scheme killing for which the defendant was on trial). Not surprisingly, we have held generally similar prior-bad-acts evidence inadmissible. *J.A.L.*, 694 N.W.2d at 753; *Barrett*, 401 N.W.2d at 189.

In the other category are cases in which the acts are indeed strikingly similar. *See Butler*, 415 N.W.2d at 636 (concluding modified "nippers" used in defendant's burglaries were sufficiently similar to admit

evidence); *Walsh*, 318 N.W.2d at 186–87 (finding two "bizarre" homicides to be sufficiently similar). Finding striking similarity requires drawing out and comparing the peculiar circumstances of the acts. *See Walsh*, 318 N.W.2d at 186 (conceding that some similarities between two homicides were "commonplace in crimes of this type" and comparing the "not commonplace" similarities). This case falls into the strikingly similar category.

According to the DCI investigator's report, which was admitted at the hearing on admissibility, Putman's computer hard drive contained thousands of photographic images, some of which were images of child pornography. The USB drive contained thirty-five images and fifteen videos of child pornography, the external hard drive contained thousands of images and ninety-four videos of child pornography, and the CD found in Putman's computer contained 645 images of child pornography. The videos and images show nude children and children engaged in sex acts. What is more, the external hard drive contained amateur photographs of a teenage girl taken with a digital camera. The photographs show a man, believed to be Putman, performing sex acts on the unconscious teen.

None of this evidence was presented to the jury. Indeed, evidence suggesting only a general preoccupation with child pornography may well have been inadmissible in this child sex abuse case. *Cf. J.A.L.*, 694 N.W.2d at 753 (holding a journal showing a fascination with death inadmissible in a juvenile adjudication proceeding for a threat to bomb a school). The district court, however, winnowed out this mass of child pornography evidence, leaving only the evidence of child pornography bearing a striking similarity to the crime for which Putman was on trial. Thus, Rodney Peterman testified at trial that, understanding the charge Putman faced, he observed what he believed to be child pornography on

Putman's computer. He then confiscated the computer and informed law enforcement. The DCI investigator testified he found child pornography on all four items he examined, and he told the jury parts of the names of two videos he found: "Two YO [year old] getting raped" and "Two YO girl getting raped during diaper change." The DCI investigator also explained the videos showed adult men sexually assaulting girls that he estimated to be two or three years of age.

There is undeniable similarity between the two videos and the act for which Putman was on trial. Like the video victims, L.R. was two years of age, although it is unclear whether Putman knew L.R.'s exact age. Further, L.R. was put to bed wearing a diaper. When she came downstairs the next day, the diaper had been removed, and there was blood on her legs. In one video, as its title makes clear, the child's diaper figures prominently. Like the video victims, testimony confirmed L.R. was the victim of vaginal penetration, which resulted in serious injuries. We conclude there was a striking similarity between the content of the two videos found on Putman's computer, and the act of sexually abusing a two-year-old girl. Putman's possessing the two videos involving the violent sexual abuse of very young children by adult men goes to the heart of the disputed issue of identity and makes it more probable he was the person who sexually abused L.R. and not the victim's father. Accordingly, the prior-bad-acts evidence was highly relevant to the identity of the perpetrator. If the evidence is determined to be relevant, the evidence is "prima facie admissible, even though it illustrates the accused's bad character." *State v. Elston*, 735 N.W.2d 196, 199 (Iowa 2007).

**C. Clear Proof.** As his next point of contention, Putman insists the State failed to clearly prove he was responsible for downloading the

two videos on his computer. As noted, proof of prior bad acts is clear if it prevents the jury from speculating or inferring from mere suspicion. *See Taylor*, 689 N.W.2d at 130. Putman points out the DCI investigator could not identify who downloaded the material on Putman's computer. Nor could he determine with certainty, from the computer's internal clock, when the videos were downloaded. Further, Rodney Peterman's testimony indicates the computer was not password protected, meaning someone other than Putman could have accessed it. Putman also notes Peterman had the computer and other electronic devices in his own possession for some period of time before turning the items over to the sheriff. This evidence, Putman argues, undermines the State's claim he downloaded the two videos whose titles were mentioned at trial.

The State takes a different view. It argues there was clear proof Putman possessed the videos—the videos on Putman's computer belonged to Putman, even if he did not download them. First, Peterman testified he built the computer for his friend Putman, and when he sold it to Putman, the computer did not contain any child pornography. In addition, although the computer and hardware were in Peterman's possession before being given to the sheriff's department, he notified the sheriff's department soon after making the discoveries. Next, Peterman testified Putman lived alone at the time he was arrested, diminishing the likelihood the videos on Putman's computer belonged to or were downloaded by someone else. Also, although Putman denied owning the videos on his computer, he never disputed owning the computer or the other electronic devices. *Cf. State v. White*, 668 N.W.2d 850, 855 (Iowa 2003) (finding a defendant's failure to dispute prior bad acts at trial supported a finding of clear proof). Most significant, the DCI investigator testified the same external hard drive that contained one of the two

videos also contained photographs of Putman with his daughter, which suggests, at a minimum, that Putman had access to the hard drive, and thus its contents belonged to him. Finally, in its limiting instruction, the district court instructed the jury that this evidence must be shown by clear proof. Considering all the evidence, there was clear proof for the jury to find Putman possessed the two videos found on his computer without speculating or inferring from suspicion.

**D. Balancing Unfair Prejudice Against Probative Value.** Since we conclude the evidence was relevant and there was clear proof Putman possessed the two videos, we must now decide whether the danger of unfair prejudice substantially outweighed the evidence's probative value. *See Richards*, 809 N.W.2d at 92. As explained above, we balance a series of factors in weighing evidence's probative value against the evidence's danger of unfair prejudice. *See, e.g., Henderson*, 696 N.W.2d at 11–12 (finding evidence's "strong prejudicial impact" substantially outweighed its probative value).

First, many of our cases have evaluated the existence of clear proof as part of the balancing process. *See, e.g., Taylor*, 689 N.W.2d at 124 (noting the existence of clear proof is a factor in the balancing process). For purposes of clarity and consistency, whether clear proof exists should remain as part of the balancing process, in addition to being analyzed as an independent analytical step. As noted above, there is clear proof Putman possessed the two videos. This factor supports admission.

We must next consider the need for the evidence that Putman possessed the two videos in light of the other available evidence and the issues in the case. *See id.* Because Putman denied that he committed the crime, the crucial issue in the case was the identity of the

perpetrator, and as already noted, Putman's possessing the two videos made it more probable he, rather than L.R.'s father Lawrence, sexually abused L.R. *See Henderson*, 696 N.W.2d at 11 (examining defendant's defense to determine the need for the evidence in light of the case's issues). Additionally, there was no forensic evidence that linked Putman to the crime, and the victim was just two years old, incapable of testifying against her abuser. The only additional evidence available to the State at the time of trial was her observed behavior after the assault. Seeing Putman after the assault, L.R. moves towards Lawrence and hides her head in her hands. Thereafter, L.R. is generally afraid of all male strangers and clings to Lawrence. The State's need to respond to Putman's assertion that it was Lawrence and not him who was the perpetrator of this sexual assault on L.R. substantially increased the probative value of the evidence of the two videos found in his possession. Since the need for the evidence on the identity of the abuser was therefore high, this supports admission of the evidence.

We also consider the strength or weakness of the evidence on identity. *See Taylor*, 689 N.W.2d at 124. Again, clear proof Putman possessed the videos showing two- or three-year-old girls being sexually abused is strong evidence suggesting Putman committed the act similar to the one in the videos against L.R. The most probative evidence on the issue of identity is the similar acts found in the two videos. All of these factors favor admission.

However, this does not end our analysis. We also must determine whether the probative value of this evidence "is substantially outweighed by the danger of unfair prejudice." Iowa R. Evid. 5.403. Evidence is unfairly prejudicial if it has " 'an undue tendency to suggest decisions on an improper basis commonly, though not necessarily, an emotional

one.' " *Newell*, 710 N.W.2d at 20 (quoting *Plaster*, 424 N.W.2d at 231). Even highly probative evidence such as this may be excluded if the danger of unfair prejudice is too great. *See State v. Reynolds*, 765 N.W.2d 283, 292 (Iowa 2009) (excluding highly prejudicial evidence despite its probative value to demonstrate the defendant's motive).

There is no question child pornography has "a strong tendency to produce intense disgust." *United States v. Loughry*, 660 F.3d 965, 974 (7th Cir. 2011) (holding danger of unfair prejudice posed by evidence of "hard core" child pornography outweighed its probative value in prosecution for distribution of "lascivious exhibition" child pornography). Accordingly, the district court in this case, mindful of the prejudicial nature of the evidence, significantly limited the testimony the State was allowed to present to the jury to the two video titles. We have previously indicated that concerns about prejudice to a defendant might be eased by narrowing the scope of the prior-bad-acts evidence presented to the jury. *See Barrett*, 401 N.W.2d at 188 (explaining "[i]t would lessen our concerns regarding unwarranted prejudice if the statements in the journal concerning plans to harm other persons could be excised" so as to leave only relevant statements, but ultimately deciding against doing so to preserve context).

The district court narrowed the scope of the prior-bad-acts evidence in this case. Consistent with the district court's ruling on the motion in limine, the State's expert was allowed to mention that child pornography had been found on each of the electronic devices. He also testified as to the file names of only two videos which were strikingly similar to the sexual assault which occurred here. The jury was not shown any images from these two videos found on Putman's computer or other electronic devices. The State was not allowed to describe the

volumes of photographs and videos of child pornography found on the electronic devices. Nor did the State mention the two videos in its opening statement. Aside from the brief testimony, the State made no mention of the two videos until its rebuttal closing argument—after being brought up by Putman's counsel. Even then, the State reminded the jury of the "very narrow purpose" for which it could use the evidence of the two video titles. The State thus carefully adhered to the district court's narrowly tailored order.

To the extent any testimony exceeded the district court's narrowly defined scope of permissible testimony, it was necessary to establish a context for the discovery of the two videos. Evidence that reveals the context of prior-bad-acts evidence is in some cases permissible. *See id.* Thus, Peterman testified about his initial discovery of the child pornography. The State's expert testified that child pornography had been found on each of the devices provided to him. Though these references must factor into the balance, under the circumstances of this case, they are not alone sufficient to tip that balance in favor of excluding the evidence.

Finally, in addition to significantly limiting the testimony presented to the jury, the district court gave a limiting instruction informing the jury of the limited purpose for which the evidence could be used. *See State v. Bayles*, 551 N.W.2d 600, 608 (Iowa 1996) (explaining a limiting instruction "help[s] to nullify the danger of unfair prejudice"); *see also Rodriguez*, 636 N.W.2d at 243 n.2 (advising trial courts to give a limiting instruction "explaining the purpose for which the prior acts evidence may be used" even if unrequested by the defendant). The district court instructed the jury Putman was "not on trial for" possessing child pornography. It also instructed the jury the evidence could "only be used

to show motive, intent, or identity of the person charged." We have explained before that in most cases a limiting instruction such as this is an antidote for the danger of prejudice: "It is only in extreme cases that such an instruction is deemed insufficient to nullify the danger of unfair prejudice." *Plaster*, 424 N.W.2d at 232. This is not one of those extreme cases.

The district court's approach to this highly prejudicial evidence "was a model of caution." *See Richards*, 809 N.W.2d at 93 n.4 (praising a district court's efforts in sifting through remote, and thus less relevant, prior-bad-acts evidence). The district court winnowed thousands of images and videos of child pornography, leaving only two highly relevant video titles for the jurors' ears. The district court did not permit the videos to be shown, nor did it permit the State to mention the videos in its opening statements, conditions with which the State strictly complied. Moreover, the district court instructed the jury on the narrow purposes for which this evidence could be used. On balancing the probative value of the evidence in this case against the prejudicial impact of such evidence, we cannot conclude that the district court abused its discretion in allowing into evidence the very limited evidence of the two videos.

### V. Conclusion.

To be clear, not all evidence that a defendant possesses child pornography is admissible as prior-bad-acts evidence. Applying our long-standing analysis of the admissibility of prior-bad-acts evidence to the circumstances of this case, we hold the district court did not abuse its discretion when it admitted evidence that Putman possessed specific videos involving child sexual abuse through the admission of the video titles in his trial for first-degree sexual abuse. The evidence was relevant to the issue of the identity of the perpetrator, there was clear proof

Putman possessed the two videos, and the evidence's probative value was not substantially outweighed by the danger of unfair prejudice.  Finding no abuse of discretion, we affirm Putman's conviction.

**DECISION OF COURT OF APPEALS AND JUDGMENT OF DISTRICT COURT AFFIRMED.**

All justices concur except Wiggins, Appel, and Hecht, JJ., who dissent; and, writing separately, Hecht, J., who dissents.

**WIGGINS**, **Justice (dissenting).**

I respectfully dissent. I agree with the court's analysis on the inadmissibility of the testimony that the police found child pornography on four items taken from Putman's house and the reference to the two video titles that the witness read into the record for the reason this evidence does not go to motive. I part company with the court's opinion because this evidence does not go to identity.

I reach this conclusion for two reasons. The first reason is the court is applying Iowa Rule of Evidence 5.404(*b*) as a rule of inclusion, rather than a rule of exclusion. The second reason is the caselaw does not allow a court to use the mere fact of possession of pornography to establish identity, no matter how similar the pornography is to Putman's alleged act.

The court applies rule 5.404(*b*) as a rule of inclusion. In *People v. Shymanovitz*, 157 F.3d 1154, 1159 (9th Cir. 1998), *abrogated by United States v. Curtin*, 489 F.3d 935 (9th Cir. 2007), a panel of the Ninth Circuit Court of Appeals held the defendant's possession of adult gay male magazines was not relevant to show the defendant's intent regarding the crimes of assault, child abuse, and criminal sexual conduct involving children. *See* 157 F.3d at 1155, 1158–60. I agree with the following statement made by the panel in its decision:

> Criminal activity is a wildly popular subject of fiction and nonfiction writing—ranging from the National Enquirer to *Les Miserables* to *In Cold Blood.* Any defendant with a modest library of just a few books and magazines would undoubtedly possess reading material containing descriptions of numerous acts of criminal conduct. Under the government's theory, the case against an accused child molester would be stronger if he owned a copy of Nabokov's *Lolita*, and any murder defendant would be unfortunate to have in his possession a collection of Agatha Christie mysteries or even James Bond stories. Woe, particularly, to

the son accused of patricide or incest who has a copy of *Oedipus Rex* at his bedside.

*Id.* at 1159. The reasoning in *Shymanovitz* is consistent with applying rule 5.404(*b*) as a rule of exclusion.

Ten years after *Shymanovitz*, the Ninth Circuit sat en banc in the case of *United States v. Curtin*, 489 F.3d at 937. There, the court held articles in the defendant's possession describing sexual acts between an adult and minors were admissible on the element of specific intent. *See id.* at 958–59. The reason for disapproving of *Shymanovitz* and allowing this testimony was based on the rationale that Federal Rule 404(b) is a rule of inclusion, rather than a rule of exclusion. *See id.* at 944, 953–54. The court applies rule 5.404(*b*) as the Ninth Circuit did in *Curtin*; thus, the court applied this rule as a rule of inclusion.

In Iowa, we initially interpreted rule 5.404(*b*), our state equivalent to Federal Rule 404(b), as a rule of inclusion. *See State v. McDaniel*, 512 N.W.2d 305, 308 (Iowa 1994) ("[E]vidence of other illegal activities that tend to prove the defendants' general propensity . . . is relevant and should be admitted."), *overruled by State v. Sullivan*, 679 N.W.2d 19, 28 (Iowa 2004). We subsequently overruled *McDaniel* and recognized rule 5.404(*b*) is a rule of exclusion. *See Sullivan*, 679 N.W.2d at 28 ("We think the better rule is that unless the prosecutor can articulate a valid, noncharacter theory of admissibility for admission of the bad-acts evidence, such evidence should not be admitted."). As a rule of exclusion, the prosecutor must prove a valid, noncharacter theory of admissibility for the testimony that the police found child pornography on Putman's computer and the reference to the two video titles that the witness read into the record. The prosecutor claims this evidence goes to identity. I disagree.

We have held that other-acts evidence can go to identity if the other acts are strikingly similar or of a unique nature. *See In re J.A.L.*, 694 N.W.2d 748, 753 (Iowa 2005). We require similarity or uniqueness to prevent the fact finder from determining "identification based on the forbidden inference of propensity." *Id.* First, the mere possession of pornography does not qualify as an act. Additionally, there is no showing in the record the child pornography found on the four items taken from Putman's house, other than the video titles read into the record, are similar or unique to this crime. Thus, the district court erred by allowing the DCI investigator's testimony of finding child pornography. The mention of dissimilar child pornography is enough to require a new trial. *See State v. Barrett*, 401 N.W.2d 184, 189 (Iowa 1987) (finding the admission of a journal entry in violation of rule 404(*b*) (now rule 5.404(*b*)) required a new trial, even though a similar journal entry was admissible under rule 404(*b*)).

The best argument the prosecutor can make for the admission of the video titles is that the video titles read in the record are similar or unique to the crime; thus, this evidence goes to identity. The problem with this argument is Iowa caselaw does not support the admissibility of these types of written material to show identity without another act or a plan. In *J.A.L.*, the State alleged the juvenile was delinquent for falsely reporting the placement of an explosive device in violation of Iowa Code section 712.7 (2003). 694 N.W.2d at 750. The State introduced notes from the juvenile's journal into evidence. *See id.* at 750–51. In holding these writings excludable under rule 5.404(*b*), we said:

> A review of J.A.L.'s journal entries indicates J.A.L. was fascinated with suicide, death, and murder. The journal entries, however, do not offer any indication J.A.L. was preparing to place a bomb threat at the school. The entries

do not contain any plans to place a bomb threat or to kill any of his fellow students.

*Id.* at 753.

Another case supporting the exclusion of these video titles is *Barrett.* There, the State charged the defendant with two counts of murder in the first degree in violation of Iowa Code sections 707.1 and 707.2 (1985). *Barrett*, 401 N.W.2d at 185. The State introduced into evidence two journals made by the defendant. *Id.* The first journal detailed a plan by the defendant to kill several people, including one for whom the defendant was the beneficiary of the person's life insurance policy. *See id.* at 185–86. The State's theory as to why the defendant killed a second person was that it was the defendant's intent to make the police believe the second person killed the first person, then committed suicide. *Id.* at 185. The second journal referred to kidnapping and ransoming an unidentified woman. *Id.* at 186. It also included plans for kidnapping and murdering a newspaper carrier and plans to plant false clues about these crimes. *Id.*

The district court admitted both journals into evidence, and the defendant was convicted. *Id.* at 185–86. On appeal, we determined the first journal was not excludable under rule 404(*b*) because the defendant had, in fact, bought life insurance on one of the murder victims, and the journal dispelled the notion the defendant bought the life insurance for a legitimate reason. *See id.* at 188. However, we held the second journal was excludable under rule 404(*b*) because the writings were not similar to the modus operandi of the murders for which the defendant was tried. *See id.* at 189. We then reversed the convictions and remanded for a new trial. *Id.*

The lesson we learn from *J.A.L.* and *Barrett* is that mere writings do not in and of themselves make the writings admissible. There has to be some link between the material sought to be introduced and the crime charged. In *J.A.L.*, the juvenile's journal entries do not support an inference he was responsible for falsely reporting the placement of an explosive device. *See* 694 N.W.2d at 753. In *Barrett*, one journal was admissible only because the defendant bought life insurance on one of the victims. *See* 401 N.W.2d at 188. Here, the possession of videos with the specific titles shows Putman's fascination with child rape. However, these videos do not offer any indication that Putman was the child rapist on the night in question or that the crime he allegedly did was in the same manner as the acts committed in the videos.

The court's opinion also relies on *State v. Butler*, 415 N.W.2d 634 (Iowa 1987), and *State v. Walsh*, 318 N.W.2d 184 (Iowa 1982). Both cases are distinguishable. In *Butler*, the burglar's tool used by the defendant in previous crimes and the tool used in the case on appeal were strikingly similar to permit admission of the other-acts evidence for the purpose of proving identity. 415 N.W.2d at 636. In *Walsh*, there was a sufficient similarity between circumstances of a homicide for which the defendant was previously convicted and the homicide for which the defendant was on trial to admit the evidence for the purpose of proving identity. 318 N.W.2d at 186–87. Thus, these cases are distinguishable because the act for which the State charged each defendant was similar and unique to other acts done by each defendant.

Here, we have no other act done by Putman. There is no connection between the videos or the crime charged. Rather the alleged other act is merely possessing certain titles of child pornography that, on their face, appear to be similar to the crime.

Other states faced with similar facts would not let the video titles or pornography into the record. Kentucky is one such state. There, the Commonwealth charged a defendant with sodomy in the first degree committed on a boy under the age of twelve. *Dyer v. Commonwealth*, 816 S.W.2d 647, 648 (Ky. 1991), *overruled in part on other grounds by Baker v. Commonwealth*, 973 S.W.2d 54 (Ky. 1998). The jury found the defendant guilty of the crime. *Id.* at 650. At trial, the court admitted evidence that graphically illustrated and described homosexual activity, among other sexually explicit materials. *See id.* at 648–49.

The Supreme Court of Kentucky reversed the defendant's conviction, finding the materials were inadmissible to profile the defendant as a pedophile. *See id.* at 652–54. In doing so, the court said, "We declare, unqualifiedly, that citizens and residents of Kentucky are not subject to criminal conviction based upon the contents of their bookcase unless and until there is evidence linking it to the crime charged." *Id.* at 652.

The Supreme Court of South Carolina came to the same conclusion. *See State v. Nelson*, 501 S.E.2d 716, 724 (S.C. 1998). There, the defendant was convicted of four counts of first-degree criminal sexual conduct with a three-year-old child and four counts of lewd act on a three-year-old child. *Id.* at 717. The district court admitted materials at the defendant's trial including children's toys, testimony about certain videos, photographs depicting young girls, and other evidence seized from the defendant's bedroom. *Id.* at 717–18. Additionally, the district court admitted the defendant's statements to police that he had fantasies about children. *Id.* at 723. The Supreme Court of South Carolina found this evidence not only inadmissible to establish identity, but also inadmissible to establish motive, intent, absence of mistake or accident,

or a common scheme or plan. *Id.* at 718–19, 724. The court reasoned that although the defendant had materials reflecting the defendant was a pedophile, the jury did not have the option to infer the defendant was acting in conformity with his alleged classification as a pedophile when he committed the crimes with which he was charged. *Id.* at 719. The court went on to say making such an inference was an improper basis to determine guilt; thus, the evidence should not have been admitted. *Id.* The court cited cases from Florida, Idaho, New York, Texas, Kentucky, Ohio, and Tennessee that reached similar conclusions. *Id.* at 719–22.

Some states allow such materials to be admissible as the complete story of the crime if the defendant showed the objects to the child. *E.g., State v. Ericson,* 986 A.2d 488, 496 (N.H. 2009). Another jurisdiction has allowed such materials to be admissible as evidence of intent in a prosecution for traveling across state lines with the intent to engage in a sexual act with a minor and using an interstate facility to attempt to persuade a minor to engage in sexual acts. *See Curtin,* 489 F.3d at 936, 958–59.

I am unable, however, to find any authority saying the prosecutor can use the mere possession of pornography depicting similar acts to those of the alleged crime to prove identity. There is nothing in the record to show any connection between the pornography and the video titles introduced into evidence in this case. If this really is the law, people of the State of Iowa must be careful in what they watch or read. The State can use a person's reading of the book *Lolita* to convict that person of underage sexual abuse. The State can use a person's fascination with crime shows to convict that person of murder.

There is no showing Putman acted upon his fascination with child pornography at the time of the crime. Without that link, the court

impermissibly allowed the jury to infer Putman was acting in conformity with this character trait when he committed the crimes with which he was charged. I would borrow a phrase from the Supreme Court of Kentucky and declare, unqualifiedly, that citizens and residents of Iowa are not subject to criminal conviction based upon the contents of their bookcase unless and until there is evidence linking it to the crime charged.

Finally, the prosecutor did not limit her final argument to the two video titles the court held admissible in her final argument. Instead, she waited until her rebuttal argument and argued the child pornography on the defendant's computer and on every single item taken from the defendant's home linked him to the crime. By not limiting her argument to the two video titles and using in her argument the pornography found on the computer and other drives, she used the totality of the pornography for propensity rather than identity. Accordingly, I would reverse Putman's conviction and remand for a new trial.

Hecht and Appel, JJ., join this dissent.

**HECHT, Justice (dissenting).**

Although I join the dissent of Justice Wiggins because I am not persuaded Putman's possession of the pornographic materials constituted an "act" under Iowa Rule of Evidence 5.404(*b*), I write separately because I conclude the evidence should have been excluded for another reason. Even assuming only for the sake of analysis that the evidence was offered for the legitimate purpose of proving identity, I believe it should have been excluded because the danger of unfair prejudice attending its admission substantially outweighed its probative value.

The factors we consider in assessing the probative force of evidence in relationship to the resulting danger of unfair prejudice are:

> the need for the evidence in light of the issues and the other evidence available to the prosecution, whether there is clear proof the defendant committed the prior bad acts, the strength or weakness of the evidence on the relevant issue, and the degree to which the fact finder will be prompted to decide the case on an improper basis.

*State v. Taylor*, 689 N.W.2d 116, 124 (Iowa 2004). I will address each of these factors in turn.

## I. The State's Need for the Evidence.

The victim in this tragic case was an infant who could not testify and identify the person who brutally injured her. Yet, I do not believe this fact weighs strongly in favor of admission of the challenged evidence. There was substantial evidence other than the pornography tending to link Putman to the crime. For example, there was evidence supporting a finding that Putman was the only adult who slept upstairs on the same level of the house where L.R. slept on the night of the sexual assault. The State also offered evidence that Putman had twice behaved in a

sexually aggressive manner toward L.R.'s mother earlier in the evening before the crime occurred. More importantly, L.R.'s father testified that Putman had blood on his hands and shirt in temporal proximity to the time when blood was observed on L.R.'s body and the crime was discovered. Other evidence offered by the State tended to prove that when L.R. saw Putman after the crime was committed, she cowered from him. These pieces of evidence suggest the State proffered other substantial evidence of Putman's guilt, and thus the prosecution's need of the pornographic evidence was not extraordinarily strong.

It should be noted that even when the State's need for the evidence is great, "the need for the evidence does not make the evidence more likely to prove that which it is offered to prove." *United States v. Stout*, 509 F.3d 796, 800 (6th Cir. 2007). My analysis of the probative value of the pornographic evidence is found below.

**II. Clarity of Proof the Defendant Committed the Prior Bad Acts.**

The State presented clear evidence that Putman's computer and related devices held a substantial quantity of pornographic images including two titles involving rape of infants. For the reasons stated in the dissent of Justice Wiggins, I am not persuaded Putman's possession of pornography is an "act" within the meaning of rule 5.404(*b*). Accordingly, I shall not further address this factor here.

**III. The Strength or Weakness of the Evidence on the Relevant Issue.**

Although Putman's possession of pornography including two titles involving rape of infants might suggest some positive correlation between Putman's interest in a specific genre of pornography and the peculiar facts of the crime, social science literature suggests the correlation might

be weak at best. *See* Melissa Hamilton, *The Efficacy of Severe Child Pornography Sentencing: Empirical Validity or Political Rhetoric?*, 22 Stan. L. & Pol'y Rev. 545, 579–80 (2011) ("Social science studies considering the correlation between viewing child pornography and contact sexual offenses against children are not consistent, though there is much evidence that only a subset of offenders who use child pornography also sexually offend against children. To support this, researchers conducting comprehensive reviews of empirical literature often conclude there is little evidence of any direct impact of viewing child pornography on the commission of contact sexual offenses. . . . In general, the literature supports the view that while child molesters may possess child pornography, those that possess child pornography are generally not likely to engage in contact offenses against children. Instead, child molesters are merely a small subset of child pornographers."). Given the available social science, I cannot conclude the evidence of Putman's possession of child pornography is strong evidence identifying him as the person who raped L.R.

**IV. Degree to Which Jurors Will Be Motivated to Decide on Improper Basis.**

On this element of the analysis, I share the view of Chief Justice Hannah of the Arkansas Supreme Court who characterized the overwhelming prejudice occasioned by the admission of evidence that pornography was found on a defendant's computer: "When the circuit court erroneously admitted into evidence the repugnant deviant pornographic pictures and titles that were found on the appellant's computer, this case was over." *Johnston v. State*, 431 S.W.3d 895, 900 (2014) (Hannah, C.J., dissenting). It is beyond dispute in my view that when the jury heard evidence that Putman's computer held

extraordinarily repugnant images of infants being raped, Putman's conviction was guaranteed. The subject matter of this evidence was so repugnant and exquisitely prejudicial that the jurors were almost certainly highly motivated to convict Putman on that propensity evidence alone. *Cf. State v. Wright*, 203 N.W.2d 247, 251 (Iowa 1972) (noting risk of inflammatory and corrosive other-crimes evidence is its tendency to "stir such passion in the jury as to sweep them beyond a rational consideration of guilt or innocence of the crime on trial" (citation omitted) (internal quotation marks omitted)); *see also United States v. LeCompte*, 131 F.3d 767, 770 (8th Cir. 1997) (stating "the danger of unfair prejudice . . . presented by the 'unique stigma' of child sexual abuse . . . is one that all propensity evidence in such trials presents"). As Chief Justice Hannah aptly suggested, when that evidence was admitted, Putman's trial was over.

In my view, this case presents a classic example of the type of evidence rule 5.404(*b*) is intended to exclude in furtherance of a fair trial. Even if it is assumed for the sake of analysis that the evidence was probative of identity—and not merely of propensity—it should have been excluded because it was so uniquely and extraordinarily prejudicial as to deny Putman a fair trial on the crime charged in this case. *Cf. United States v. Fawbush*, 634 F.3d 420, 423 (8th Cir. 2011) ("Had the testimony been relevant to a material issue, we believe it still should not have been admitted. Under our standard, relevant other act evidence is admissible only if its probative value outweighs its potential for unfair prejudice. ' "Unfair prejudice" . . . means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.' We believe the evidence that Fawbush had sexually abused his daughters and had fathered a child with one of them to have

been so inflammatory on its face as to divert the jury's attention from the material issues in the trial. Consequently, the prejudicial effect of this evidence outweighed any legitimate probative value it may have had." (Citations omitted.)). Accordingly, I conclude the district court abused its discretion in admitting the evidence, and I would reverse and remand for a new trial. I therefore respectfully dissent.